In re JOINT EASTERN AND SOUTHERN DISTRICTS ASBESTOS LITIGATION.

In re JOHNS–MANVILLE CORPORATION, et al., Debtors.

Bernadine K. FINDLEY, as Executrix of the Estate of Hilliard Findley, Uma Lail Caldwell, as Executrix of the Estate of Odell Caldwell, Edward Lindley, Joseph C. Jones and James William Barnette, Jr., on behalf of themselves, and all others similarly situated as beneficiaries of the Manville Personal Injury Settlement Trust, Plaintiffs,

v.

Donald M. BLINKEN, Daniel Fogel, Francis H. Hare, Jr., Christian E. Markey, Jr. and John C. Sawhill, not individually but solely in their capacities as Trustees of the Manville Personal Injury Settlement Trust, Defendants.

Bankruptcy Nos. 82 B 11656 (BRL) through 82 B 11676 (BRL), Inclusive.

Class Civ. A. No. 90–3973.

United States District Court, E. and S.D. New York. Bankruptcy Court, S.D. New York.

Nov. 30, 1990.

---

Caplin & Drysdale, New York City by Elihu Inselbuch, Baron & Budd, Dallas, Tex. by Frederick M. Baron, Wilentz, Goldman & Spitzer, Woodbridge, N.J. by Christopher M. Placitella, Patten, Wornom & Watkins, Newport News, Va. by Robert R. Hatten, Rose, Klein & Marias, Los Angeles, Cal. by Robert B. Steinberg, Ness, Motley, Loadholt, Richardson & Poole, Charleston, S.C. by Ronald L. Motley, Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Leslie Gordon Fagen, for plaintiffs.

Debevoise & Plimpton, New York City by Roger E. Podesta, Anna E. Cohen, for defendant Owens–Corning Fiberglass Corp.

Wood, Williams, Rafalsky & Harris, New York City by Earl L. Scott, for defendant H.K. Porter.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y. by Paul F. Jones, for defendant General Refractories & Grefco, Inc.

Wachtell, Lipton, Rosen & Katz, New York City by Amy R. Wolf, for defendant Manville Personal Injury Settlement Trust, Manville Personal Injury Settlement Trust, Washington, D.C. by David T. Austern.

Casey, Gerry, Casey, Westbrook, Reed & Hughes, San Diego, Cal. by Frederick Schenk, Jacobs & Crumplar, P.A., Wilmington, Del. by Robert Jacobs, Henerson & Goldberg, P.C., Pittsburgh, Pa. by Thomas W. Henderson, Cadwalader, Wickersham & Taft, New York City by H. Peter Haveles, Jr., McCarter & English, Newark, N.J. by Andrew T. Berry, Boulanger, Finley & Hicks, New York City by Gregg J. Borri, Pustovino, Pederson, Tilton & Parrington, Minneapolis, Minn. by John H. Faricy, Jr., The Jaques Admiralty, Detroit, Mich. by Alan Kellman, Boyar, Higgins & Hayden, Morristown, N.J. by James J. Higgins, Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, N.J., attorneys for E.J. Bartells by James Crawford Orr, Glasser & Glasser, Norfolk, Va. by Richard S. Glasser, Porzio, Bromberg & Newman, Morristown, N.J. by D. Jeffrey Campbell.

Before WEINSTEIN, District Judge, and BURTON R. LIFLAND, Chief Judge.

## MEMORANDUM ON STAYS

WEINSTEIN, District Judge:

This Memorandum covers the authority of a federal court to stay proceedings in all other courts to prevent the inequitable distribution of trust assets available to pay claims filed by the trust's beneficiaries. Part One briefly describes the history of the bankruptcy proceedings of the Manville Corporation and certain affiliated entities ("Manville"). Part Two touches upon the fiscal problems experienced by the Manville Personal Injury Settlement Trust (the "Trust"). Part Three outlines the procedural background of the proceedings that led to the class action complaint and the stipulation of settlement. Finally, Part Four provides the legal basis for enjoining all proceedings against the Trust.

### I. MANVILLE BANKRUPTCY

Manville filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code on August 26, 1982. At that time, Manville, the nation's leading producer and distributor of asbestos, faced a substantial number of asbestos disease claims, including more than 17,000 pending tort suits. It estimated its projected asbestos liability at more than one billion dollars. It sought bankruptcy protection to devise a means to cope with its burgeoning asbestos liability.

On August 22, 1986, Manville proposed the Second Amended and Restated Plan of Reorganization (the "Plan"). Insofar as is relevant, the Plan provided for the creation of the Trust "out of which all asbestos-re-

lated claims will be .paid." *See In re Johns–Manville Corp.,* 68 B.R. 618, 621 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom., Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir.1988). The Plan was designed to deal with the rapidly increasing number of claims filed against Manville. It was confirmed by the bankruptcy court on December 22, 1986. *Id.*

The parties in the Manville bankruptcy agreed "as a condition precedent to confirmation of the Plan [that] the Bankruptcy Court would issue an injunction channeling all asbestos-related personal injury claims to the Trust...." *Kane,* 843 F.2d at 640. Thus, the Trust became the exclusive entity from which to seek compensation for existing and future asbestos health claims caused by exposure to Manville products.

■ Pursuant to the Plan, the courts have continuing responsibility to implement the terms of the Manville reorganization and to protect the interests of the beneficiaries of the Trust. *See Second Amended and Restated Plan of Reorganization for Johns–Manville Corporation* Art. X (Nov. 28, 1988) (retention of jurisdiction); Trust Agreements §§ 6.12, 6.13 (same).

## II. FISCAL PROBLEMS OF THE TRUST

Under the provisions of the Plan, Manville would fund the Trust for at least thirty years. The Trust received $150 million in cash plus $5,444,422 in accrued interest from Manville. Additional funding was contributed from the following sources: insurance settlement proceeds and cash totaling $909 million; two bonds with an aggregate value of $1.8 billion payable in installments commencing August 1991 and extending through November 2014; and twenty-four million shares of Manville common stock (50% of common stock outstanding) plus 7,200,000 shares of Manville convertible preferred stock—in all eighty percent of the stock in the reorganized Manville after conversion. Finally, beginning in 1992 the Trust is entitled to · twenty percent of Manville's profits for as long as necessary to satisfy all asbestos health claims.

The Plan provided for the creation of a Claims Resolution Facility ("CRF") to administer the processing and payment of claims. As specified in the Plan, the CRF processes claims in the order in which they are liquidated, the first-in first-out ("FIFO") system. *Plan,* Annex B, § I.A.2. Although the CRF states that claims liquidated by settlement or arbitration must be paid shortly after liquidation, *id.* at §§ II. B.9, III.D.6, III.E.5, no similar urgency is expressed for payment of claims that have been liquidated through trial.

It was assumed that the Trust would have adequate funds to satisfy all asbestos health claims as they became liquidated if the process occurred over a period of time coinciding with the Plan's long-term funding provisions. *See Kane,* 843 F.2d at 640. In fact, the number of claims, the rate at which they were filed and their average liquidated value far exceeded the projected amounts. For example, as of March 30, 1990, the Trust had received more than 150,000 claims, a fifty percent increase over the highest number estimated when the Plan was approved. The Trust has settled 22,386 of those claims at an average liquidated value of $42,000—far above the predicted average—leaving roughly 130,-000 claims pending. The cost of satisfying those claims is anticipated to exceed by fifty percent the value Manville had extrapolated from its earlier pre-petition experience. By the Spring of 1990, the Trust was effectively out of money to pay its current and short term obligations.

## III. PROCEDURAL BACKGROUND

A district judge with substantial responsibility for pending asbestos cases in the Southern and Eastern Districts of New York (particularly the New York Navy Yard and related cases) was assigned supervisory responsibility over the reorganization of the Johns–Manville Corporation (consolidated cases) 82 BR 11656 (BRL) through 82 B 11676 (BRL). *See* Order of James L. Oakes, Chief Judge, Second Circuit dated January 23, 1990 and July 20,

1990; Order of Charles L. Brieant, Chief Judge, United States District Court, Southern District of New York dated July 20, 1990.

In May 1990, the state and federal judges presiding jointly over the consolidated New York Navy Yard and related asbestos cases requested that the Trust furnish a report on the initial assets of the Trust; the initial projections concerning future claimants, assets and payment schedules at the time the Plan was approved; and the Trust's current assets, its administrative expenses, legal fees, and other transaction costs.

The Trust's responses indicated that the assets anticipated from Manville would not cover the amounts that the Trust owed for liquidated claims and that the Plan did not provide for an additional influx of funds for a substantial period of time. The Trust estimated a deficit of $19,600,000 at the end of 1990 assuming no additional claims were settled or paid. In fact, the pressure of state and federal trials and plaintiffs all over the country was threatening a deluge of hundreds of millions of dollars in judgments and settlements which could not be paid.

In an effort to cope with the impending shortfall of cash, the Trust established a deferred payment plan under which the majority of cases would receive up to 40% of the total settlement amount within a year of settlement and the balance within five years, subject to the availability of funds. As a result, approximately $306 million of settled and unpaid claims as of June 30, 1990 will be paid in 1991 or later. Even this program, however, would leave the Trust with insufficient funds to satisfy its obligations in the next twelve months.

Based on the information received from the Trust, the District Court for the Southern and Eastern District of New York orally issued a temporary stay of payments concluding that "[j]udgments obtainable in the forthcoming consolidated/joint trials will, there is a high probability, be uncollectible from Trust funds unless a temporary stay of payments and a stay on the enforceability of judgments against the Trust is accomplished, pending the restructuring [of the Trust]." Memorandum and Order, *In re Joint Eastern and Southern District Asbestos Litigation*, NYAL/BNY Index No. 4000 (E.D.N.Y. July 9, 1990), 1990 WL 115761. The partial stay was imposed on enforcement of judgments against the Trust in light of the "severe cash shortage in the Trust constituting a judicial emergency." *Id.* Such a stay was essential "to maximize available and prospective assets of the Manville Trust" for the use of all asbestos victims and their families. *Id.*

Leon Silverman, the special advisor in the Manville reorganization proceedings, was appointed to assist in the necessary restructuring of the Trust. The Trust, with the aid of Mr. Silverman, plaintiffs' attorneys and other interested parties, was requested "(1) to develop eligibility criteria and restructure the payment schedule and (2) to refinance the Trust so that it has sufficient funds now and in the future to make required payments." *Id.*

Further stays were ordered by the chief bankruptcy judge of the Southern District of New York and the district judge for the Southern and Eastern Districts of New York to preserve the corpus of the Trust while the parties negotiated the restructuring. *See, e.g.,* Memorandum and Order, *In re Joint Eastern and Southern District Asbestos Litigation; In re Johns–Manville Corp.,* (S.D.N.Y., E.D.N.Y & Bankr. S.D.N.Y. Nov. 6, 1990), *infra* p. 660.

On September 7, 1990, the Trust and Manville announced an agreement in principle to fund approximately $520 million in additional monies to the Trust over the next seven years. Negotiations with plaintiffs' attorneys and others on a restructured payment plan continued.

The Trust moved for a determination that it constituted a "limited fund" within the meaning of Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure on September 18, 1990. The Honorable Marvin E. Frankel was appointed Special Master to determine whether the financial assets of the Trust are so limited that payment of asbestos-related personal injury and wrongful

death claims, cross-claims, and third-party claims brought against the Trust are in jeopardy and whether payment of claims on an individual basis would exhaust the Trust's available and projected assets precluding payments to some claimants.

Special Master Frankel submitted his report on November 3, 1990. After several days of hearings and extensive submissions, he concluded that

[h]owever insolvency is defined, the Trust is deeply insolvent.... The Trust's assets and expectations of future receipts are and will be so limited that there is a substantial risk that payments for present and prospective asbestos-related claims for personal injury and wrongful death will be in jeopardy.... There is a substantial probability that the award of damages to earlier litigants will exhaust the Trust's available and projected assets.... The foregoing findings and conclusions, inasmuch as they supply affirmative answers to the Court's questions, are reached upon the basis of evidence that is clear and convincing to the point of being undisputed and beyond dispute in all essential respects.

Special Master's Report, *In re Johns–Manville Corp.*, Nos. 82 B 11656 (BRL) through 82 B 11676 (BRL), at 20–21 (E.D.N.Y. Nov. 3, 1990), *infra* p. 668.

On November 19, 1990, the United States District Court for the Eastern and Southern Districts of New York and the Bankruptcy Court for the Southern District of New York (the "courts") issued the following orders to show cause returnable on November 23, 1990: first, why an order should not be issued conditionally certifying a class action, appointing the named plaintiffs as class representatives and appointing class counsel; second, why an order should not be issued appointing a legal representative for beneficiaries of the Trust who have not yet asserted asbestos disease claims; and third, why an order should not be issued enjoining beneficiaries of the Trust from commencing or continuing any action against the Trust or executing or otherwise enforcing judgments against the Trust. On the same day putative class representatives filed a class action complaint; the special advisor, Leon Silverman, submitted a report notifying the courts of settlements with the Trust, Manville and representative plaintiff attorneys; and the Trust and class representatives filed a proposed stipulation of settlement, *see infra* p. 668. Laurence Gold Esq., was appointed *amicus curiae* on November 20, 1990 to assist in reviewing the fairness of the proposed settlement.

On November 23, 1990, after a hearing on the orders to show cause, the court issued the following orders: first, an Order Conditionally Certifying Class Action and Appointing Representative Counsel and Others, *see infra* p. 681; second, an Order Setting Fairness Hearings in New York, Washington D.C., New Orleans and San Francisco in January 1990 and Approving a Form of Notice, *see infra* p. 683; third, an Order Staying Payments by the Trust, *see infra* p. 687; fourth, an Order Staying Proceedings against the Trust, *see infra* p. 688; fifth, an Order Making Exceptions to Stay of Proceedings, *see infra* p. 689; and sixth, an Order Appointing Defendants' Representatives, *see infra* p. 691.

## IV. LEGAL ANALYSIS

Asbestos litigation has generated unprecedented challenges to both state and federal court systems. A class action—seeking to restructure the Trust and to end the repetitious, wasteful and burdensome litigation that has become a hallmark of asbestos proceedings—may provide one tool to assist in disposing of all present and future asbestos claims expeditiously and equitably.

### A. Effect of Class Certification

█ Conditional certification of a national mandatory class action pursuant to Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure will supercede all litigation against the Trust pending in federal and state forums. *See In re Federal Skywalk Cases*, 680 F.2d 1175, 1180–82 (8th Cir.), *cert. denied*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982) (certification order will enjoin prosecution of pending state court

actions). The effect of conditional class certification will be for all pending state and federal cases to become part of the mandatory class and cease to exist as independent cases. If the stipulation of settlement is approved by the court, the pending actions will be adjudicated according to its terms—saving valuable Trust assets for the payment of class members rather than litigation costs.

To permit the tens of thousands of pending actions and potential actions against the Trust to proceed in their present form would substantially impair or impede the interests of other claimants and would significantly deplete the assets available to resolve all pending and future cases. The pending federal and state cases, if allowed to continue independently, will seriously hinder the ability of the court to evaluate the adequacy and fairness of the proposed settlement of the class action by constantly depleting the Trust's assets. The need to end this hemorrhaging of the corpus of the Trust is especially acute given Special Master Frankel's finding that the Trust is a limited fund coupled with the prior record of its rapid depletion.

■ After conferring with many state and federal judges on the wisdom, propriety and effect of a mandatory national class action, this court finds a general consensus among all judges that pending cases should be superceded by and become part of, a single national class action. Some cases are actually on trial. The court has consulted with many of the judges with cases actually on trial and has allowed those cases to continue to judgment. This practice is efficient and reflects the growing cooperation among federal and state courts in adjudicating asbestos cases. The judgments, in any such cases, will be controlled by the stipulation of settlement as of November 19, 1990, if the stipulation is approved.

B. Operation of Anti–Injunction Act

■ Since the certification of a mandatory national class action will enjoin all pending cases including those filed in state courts, the court considers the implications of the Anti–Injunction Act. 28 U.S.C. § 2283 (1988); *see In re Dennis Greenman Sec. Litig.*, 829 F.2d 1539, 1544 (11th Cir. 1987). The Anti–Injunction Act precludes a federal court from staying existing proceedings in state court "except as expressly authorized by Act of Congress, or when necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283 (1988); *see Standard Microsystems Corp. v. Texas Instruments Inc.*, 916 F.2d 58, 60 (2d Cir.1990).

■ The Anti–Injunction Act only prohibits a federal court from staying pending state court proceedings and does not affect a court's power to enjoin future state actions or any actions in federal court. *See Dombrowski v. Pfister*, 380 U.S. 479, 484 n. 2, 85 S.Ct. 1116, 1119 n. 2, 14 L.Ed.2d 22 (1965) (Anti–Injunction Act does "not preclude injunctions against the institution of state court proceedings, but only bar[s] stays of suits already instituted"); *accord B & A Pipeline Co. v. Steve Dorney*, 904 F.2d 996, 1001 n. 15 (5th Cir.1990) (same). While the policy underlying the Anti–Injunction Act is the desire "to avoid disharmony between federal and state systems, the exception in Section 2283 reflects congressional recognition that injunctions may sometimes be necessary in order to avoid that disharmony." *Amalgamated Sugar Co. v. NL Industries*, 825 F.2d 634, 639 (2d Cir.), *cert. denied*, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987). Under the present circumstances, the courts' power to enjoin the pending state cases falls within all three exceptions to the Anti–Injunction Act.

Courts have interpreted the "necessary in aid of jurisdiction" exception liberally "to prevent a state court from … interfering with a federal court's flexibility and authority" to decide the case before it. *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970); *see In re Baldwin–United Corp.*, 770 F.2d 328, 337 (2d Cir.1985) (same); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1334 (5th Cir.1981), *cert. denied*, 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982) (same); *see also* Redish, *The Anti–Injunc-*

*tion Statute Reconsidered,* 44 U.Chi.L. Rev. 717, 754 (1977) ("necessary in aid of jurisdiction" exception should be construed "to empower the federal court to enjoin a concurrent state proceeding that might render the exercise of the federal court's jurisdiction nugatory.").

■ The Second Circuit has recognized that a stay of proceedings in state court is appropriate under the "necessary in aid of jurisdiction" exception "where a federal court is on the verge of settling a complex matter, and state court proceedings undermine its ability to achieve that objective." *Standard Microsystems Corp. v. Texas Instruments Inc.,* 916 F.2d 58, 59 (2d Cir. 1990); *see United States v. International Brotherhood of Teamsters,* 907 F.2d 277, 281 (2d Cir.1990) (stay is appropriate to allow district judge to "legitimately assert comprehensive control over complex litigation."); *In re Baldwin–United Corp.,* 770 F.2d 328, 337 (2d Cir.1985) (court can issue injunction against actions in state court that would "frustrate the district court's efforts to craft a settlement"); *see also James v. Bellotti,* 733 F.2d 989, 994 (1st Cir.1984) (provisionally approved settlement may justify injunction against state court actions).

■ A mandatory national class action certified pursuant to Rule 23(b)(1)(B) falls squarely within the rationale of these controlling Second Circuit precedents. The courts are in the process of reviewing the stipulation of settlement of the proposed class action encompassing the claims of all beneficiaries of the Trust. At this critical juncture, the courts must be able to continue—confident that the assets available to settle the case will remain intact. An injunction of all proceedings is necessary to implement the terms of the settlement and to protect the courts' jurisdiction over the class action.

■ The All–Writs Act furnishes additional authority to certify the class action and to stay all pending proceedings. It empowers a federal court to issue "all writs necessary or appropriate in aid of their respective jurisdictions...." 28 U.S.C. § 1651 (1988). The Second Circuit has held that cases interpreting the "necessary in aid of jurisdiction" exception in the Anti–Injunction Act are "helpful in understanding the meaning of the All–Writs Act." *See In re Baldwin–United Corp.,* 770 F.2d 328, 335 (2d Cir.1985); *see also United States v. District of Columbia,* 654 F.2d 802, 809 n. 16 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981) (same); *Bruce v. Martin,* 680 F.Supp. 616, 621 (S.D.N.Y.1988) (same). Whether viewed as an affirmative grant of power to the courts or an exception to the Anti–Injunction Act, the All–Writs Act permits courts to certify a national class action and to stay pending federal and state cases brought on behalf of class members.

■ The All–Writs Act allows a federal court to issue an injunction against actions in state court "even before a federal judgment is reached...." *In re Baldwin–United Corp.,* 770 F.2d 328, 335 (2d Cir. 1985). Such an injunction allows the court to protect its settlement efforts. *Id.* at 337.

■ The courts have received a proposed stipulation of settlement resolving all present and future claims asserted against the Trust. Conditional certification of the class is the first step on the road to implementation of the stipulation of settlement. Rule 23 of the Federal Rules of Civil Procedure mandates exercise of power to maintain the status quo during the trial and appellate process. Fairness hearings, for example, must now be conducted. A stay of all proceedings must be entered now to protect the corpus of the Trust and ensure an equitable result for all its present and future beneficiaries. Thus, the rationale of *Baldwin–United* requires interpretation of the Anti–Injunction Act to permit operation of Rule 23. *See Standard Microsystems Corp. v. Texas Instruments Inc.,* 916 F.2d 58, 59 (2d Cir.1990).

The "in aid of jurisdiction" exception would also authorize a stay of state court proceedings when the "federal court's jurisdiction is *in rem* and the state court action may effectively deprive the federal court of the opportunity to adjudicate as to

the *res* ...." *Standard Microsystems Corp. v. Texas Instruments Inc.,* 916 F.2d 58, 59 (2d Cir.1990); *Mitchum v. Foster,* 407 U.S. 225, 235–37, 92 S.Ct. 2151, 2158–59, 32 L.Ed.2d 705 (1972) (same).

■ Several courts have considered class action litigation analogous to *in rem* actions given their magnitude and complexity. In *Baldwin–United* the class action proceeding was "so far advanced that it was the virtual equivalent of a res over which the district judge required full control." *In re Baldwin–United Corp.,* 770 F.2d 328, 337 (2d Cir.1985); *see Battle v. Liberty National Life Ins. Co.,* 877 F.2d 877, 882 (11th Cir.1989) ("makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a *res* to be administered"); *cf. In re Chateaugay Corp.,* 109 B.R. 613, 622 (S.D. N.Y.1990) (injunction is "in the nature of an *in rem* injunction, in which the *res,* the reorganization, is protected"). The *in rem* analogy is even stronger under present circumstances since the Trust constitutes a *res* that has been created in a bankruptcy proceeding to compensate all injuries resulting from Manville asbestos-containing products.

The danger of existing state court proceedings depleting the Trust is readily apparent in view of Special Master Frankel's report. Court judgments cannot continue to eviscerate the Trust's assets. Under these circumstances, the *in rem* nature of the court's jurisdiction over the class action provides an additional ground for sustaining the stay of all existing proceedings as consistent with the Anti–Injunction Act.

■ Federal courts have also relied upon the "in aid of jurisdiction" exception to the Anti–Injunction Act to justify a stay of existing state proceedings in interpleader actions pursuant to Rule 22 of the Federal Rules of Civil Procedure. *See, e.g., United States v. Major Oil Corp.,* 583 F.2d 1152, 1158 (10th Cir.1978) (stay of state proceedings in Rule 22 interpleader is in aid of the court's jurisdiction); *Emmco Ins. Co. v. Frankford Trust Co.,* 352 F.Supp. 130, 132–33 (E.D.Pa.1972) (same); *Pan American Fire & Casualty Co. v. Revere,* 188 F.Supp. 474, 484–85 (E.D.La.1960) (same). Interpleader is traditionally employed when two or more persons claim an interest in a fund, and the claims to the fund may exceed the total value of that fund. *See State Farm Fire & Casualty Co. v. Tashire,* 386 U.S. 523, 533 n. 15, 87 S.Ct. 1199, 1205 n. 15, 18 L.Ed.2d 270 (1967).

■ Limited fund class actions closely resemble an interpleader action. *Cf. In re Federal Skywalk Cases,* 680 F.2d 1175, 1182–83 (8th Cir.), *cert. denied,* 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982) (implication that a limited fund is analogous to an interpleader). In light of the severely limited assets of the Trust, the class members here are virtually identical to interpleader claimants. Persons with asbestos claims against Manville must proceed against the Trust in accordance with the injunction entered as part of the bankruptcy reorganization proceedings. The class members, like interpleader claimants, must recover from the Trust or not recover at all.

Given the similarity of the present class action to an interpleader action, a stay of state proceedings would be warranted under the "necessary in aid of jurisdiction" exception. Only by staying all other proceedings can the class action achieve the goal of adjudicating all claims against the Trust in one action and prevent recovery from the Trust in an inequitable or inconsistent manner.

■ The courts' role with respect to the Trust's reorganization proceedings provides additional authority to enjoin the pending proceedings. The courts retain jurisdiction to oversee the reorganization process even after a plan of reorganization is confirmed. The Second Circuit has rejected the "contention that adoption of the reorganization plan ousted the court of jurisdiction...." *In re Dilbert's Quality Supermarkets, Inc.,* 368 F.2d 922 (2d Cir. 1966); *cf. United States v. Energy Resources Co., Inc.,* —— U.S. ——, 110 S.Ct. 2139, 2141–43, 109 L.Ed.2d 580 (1990) (section 105 allowed court to order IRS to

apply post-confirmation payments in manner that ensured success of reorganization plan).

As is apparent from Special Master Frankel's report, the Trust cannot meet its current obligations or its most optimistic projected liability in the future; this shortfall necessitates the restructuring envisioned by the stipulation of settlement. Without such a restructuring, the claimants with judgments would obtain a priority over those claimants who have yet to settle with or to obtain judgments against the Trust. Courts cannot countenance rewarding those who win the race to the courthouse door at the expense of in excess of 130,000 persons who claim asbestos-related injuries from exposure to Manville products.

The Trust is in desperate need of restructuring to enable it to meet its present and future obligations. The Trust estimates that for the first nine months of 1990 it incurred nearly $46 million dollars in administrative and litigation expenses. Such unnecessary expenses are depleting the Trust's assets and will cause some persons injured by Manville products to go uncompensated. This situation cannot continue. *Cf. In re Johns–Manville Corp.*, 920 F.2d 121, 123–24 (2d Cir.1990) (upholding suspension of operation of Manville Property Damage Trust as a "practical and economically sensible balancing of the interests of all parties involved.").

■ A stay of all pending actions is an efficient mechanism to preserve Trust assets for injured claimants. Authority to issue the stay is found in section 105(a) of the Bankruptcy Code, which allows the courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a) (1988). This section provides a broad grant of equitable power to ensure that a plan of reorganization is effectuated. *See, e.g., In re Chateaugay Corp.*, 109 B.R. 613, 622 (S.D.N.Y.1990) (bankruptcy court has power to enjoin the "prosecution of suits which threaten integrity of the bankruptcy process"); *In re*

*Johns–Manville Corp.*, 91 B.R. 225, 227–28 (S.D.N.Y.1988) (enjoining under section 105 post-confirmation actions against reorganized debtor and its insurers).

Injunctions issued under section 105(a) would satisfy all the exceptions to the Anti–Injunction Act. First, the injunction would be expressly authorized by an act of Congress, 11 U.S.C. § 105(a) (1988). Second, the injunction would serve to protect and effectuate the bankruptcy court's judgment confirming the plan of reorganization. *See In re Johns–Manville Corp.*, 68 B.R. 618 (Bankr.S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom.*, *Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988). Finally, the injunction would be necessary in aid of the courts' *in rem* jurisdiction over the Trust to preserve the integrity of reorganization process.

■ Under the circumstances of this case, it seems apparent that the Anti–Injunction Act would permit certification of a mandatory class action. Nevertheless, two courts, *In re Temple (Raymark Industries)*, 851 F.2d 1269, 1272 (11th Cir.1988) and *Waldron v. Raymark Indus., Inc.*, 124 F.R.D. 235 (N.D.Ga.1989), have denied certification of mandatory class actions relying in part on dicta in *In re Federal Skywalk Cases*, 680 F.2d 1175, 1182–83 (8th Cir.), *cert. denied*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982). While these cases are contrary to controlling Second Circuit precedent, they have sparked significant commentary and merit discussion.

In *Skywalk*, the Eighth Circuit vacated certification of a limited fund class action predominantly on the ground that the finding of a limited fund was inadequate and unsupported as a matter of law. *Id.* at 1182–83. The Eleventh Circuit, in dicta, has construed the *Skywalk* decision as holding that the Anti–Injunction Act bars certification of a mandatory class action if state cases have commenced. *See In re Temple (Raymark Industries)*, 851 F.2d 1269, 1272 (11th Cir.1988), on remand, *Waldron v. Raymark Indus., Inc.*, 124 F.R.D. 235 (N.D.Ga.1989). The district court, on remand, never reached the "in aid of jurisdiction" exception to the Anti–Injunction

Act because it summarily concluded that the *Temple* dicta precluded certification of a non-opt-out class action when state cases are pending. 124 F.R.D. at 237–38.

The *Temple* court's interpretation of *Skywalk* and its subsequent application in *Waldron*, however, ignore the fact that the basis for vacating certification in *Skywalk* was the absence of a limited fund. · Without the limited fund as a jurisdictional predicate, a court simply cannot proceed with a limited fund class action or enjoin existing state actions. The "necessary in aid of jurisdiction" exception to the Anti–Injunction Act would not apply because the court is without jurisdiction to aid. Properly construed, *Skywalk* stands for the limited proposition that where class certification is improper because no limited fund exists, a court cannot rely upon the "necessary in aid of jurisdiction" exception to the Anti–Injunction Act to justify a stay of existing state proceedings. No matter how construed, *Skywalk* has no application to an injunction issued to protect a trust *res* such as the one now before us.

Moreover, the special circumstance in *Skywalk* was that the local bar overwhelmingly desired that the cases, which arose out of one occurrence in one state, remain in the state court. It is, perhaps, with this background in mind that the majority opinion in *Skywalk* noted that its position was based "on the facts before us." *Skywalk*, 680 F.2d at 1180. Obviously, that circumstance does not pertain to asbestos which has generated tens of thousands of cases in federal and state courts in every part of the Nation.

Even narrowly construed, the dicta contained in the *Skywalk* decision and its subsequent interpretation by other courts have generated considerable criticism by other courts and commentators. *See, e.g., In re Dennis Greenman Sec. Litig.*, 829 F.2d 1539, 1544 (11th Cir.1987) ("inclined to hold the [Anti–Injunction] Act not a bar to class certification"); *rev'd on other grounds*, 622 F.Supp. 1430, 1449–50 & n. 15 (S.D.Fla. 1985) (disagreeing with reasoning of *Skywalk* majority and certifying class for settlement); *In re Federal Skywalk Cases*, 680 F.2d 1175, 1192 (8th Cir.) *cert. denied*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982) (Heaney, J., dissenting) ("It seems self-evident that an injunction to protect the ordinary scope of a mandatory class action is 'necessary in aid of' the federal jurisdiction over such a class."); *In re Asbestos School Litigation*, 104 F.R.D. 422, 436 (E.D.Pa.1984), *modified on other grounds*, 789 F.2d 996 (3d Cir.1986) (same); Gordon, *The Optimum Management of the Skywalk Mass Disaster Litigation by Use of the Federal Mandatory Class Action Device*, 52 UMKC L.Rev. 215, 231–32 (1984) (noting that several articles have described the Eighth Circuit's decision as "unreasonable," "untenable," "arcane," "obscure," "unnecessarily narrow" and "inequitable."); Note, *Class Certification in Mass Accident Cases Under Rule 23(b)(1)*, 96 Harv.L.Rev. 1143, 1159–61 (1983) (certification of mandatory class comes within "necessary in aid" of jurisdiction exception to Anti–Injunction Act); Note, *Mechanical and Constitutional Problems in the Certification of Mandatory Multistate Mass Tort Class Actions Under Rule 23*, 49 Brooklyn L.Rev. 517 (1983) (compelling reasons exist to find that the "necessary in aid of jurisdiction" exception allows mandatory class certification).

The *Skywalk* dicta is also contrary to the presumption of validity enjoyed by the Federal Rules of Civil Procedure, which requires means to effectively apply Rule 23. *See Hanna v. Plumer*, 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965).

## V. CONCLUSION

The United States District Court for the Southern and Eastern Districts of New York and the Bankruptcy Court for the Southern District of New York have by their orders dated November 23, 1990, with exceptions, properly enjoined all litigation pending against the Trust and restrained any proceedings from being instituted against the Trust.

So ordered.

LIFLAND, C.J., concurs.

## APPENDIX A

## MEMORANDUM AND ORDER

### ON STAY

November 6, 1990.

On July 14, 1990, after a hearing, this court issued an Order temporarily staying certain payments by the Manville Personal Injury Settlement Trust. *See In re Joint Eastern and Southern District Asbestos Litigation; In re Johns–Manville Corporation*, NYAL/BNY Order (memorializing oral order of July 9, 1990; signed on July 14 and filed on July 16, 1990). The purpose of that Order was to preserve Trust funds while the Special Advisor to the Bankruptcy Court developed a plan for restructuring the Trust payment schedule and refinancing the Trust.

On August 6, 1990, the Order was extended until September 6, 1990. On September 6, 1990, the Order was extended until October 6, 1990. On October 6, the Order was extended until November 6, 1990. The Order was clarified on November 1, 1990.

The Special Advisor to the Bankruptcy Court, Leon Silverman, and the Trust and the Manville Corporation announced an agreement in principle on a proposed restructuring and refinancing of the Trust. Since that time, fruitful negotiations have been reported in an effort to work out details of the restructuring. Additional time, it is reported, is necessary to finalize the proposed agreements. The court orders that the stay be extended until November 16, 1990 to preserve the corpus of the Trust while negotiations to protect equitably all claimants—past and future—continues.

The Manville Personal Injury Trust is hereby ordered:

(1) Except as noted in paragraph (3) below, to make no payments for claims heretofore settled and to make no payments for claims settled between the date of this Order and November 16, 1990.

(2) To make no payments for judgments heretofore entered and to make no payments for judgments entered between the date of this Order and November 16, 1990.

(3) The Trust is permitted to make payments for Hardship Claims and Exigent Health Claims previously settled and to pay Hardship Claims and Exigent Health claims settled between the date of this Order and November 16, 1990.

(4) The Trust is permitted to pay Trust expenses, disbursements, legal fees of attorneys retained by the Trust, the fees of the Special Advisor to the Bankruptcy Court and his counsel to the extent approved by the Bankruptcy Judge, operating expenses including staff salaries, Trustees' fees, legal fees of Counsel to the Selected Counsel for the Beneficiaries, and all ordinary and necessary Trust expenses; and it is hereby

Further ordered that the execution or other enforcement of judgments against the Trust and/or its assets, including assets in the possession of Manville Corporation or any other persons or entities other than the Trust, and any other effort to collect upon such judgments by whatever means or remedies, including judicial process or nonjudicial means, and the obtaining or enforcement of provisional remedies against the Trust or its assets are hereby stayed.

No court or person is stayed from proceeding with trial or any other proceedings or from negotiating settlements or from taking any action in connection with cases or claims pending or hereafter commenced.

The Order shall expire on November 16, 1990 unless earlier terminated. Upon application of any party or interested person, this Order will be modified for good cause shown.

The Trust is hereby directed to serve a copy of this Order on all parties to the Brooklyn Navy Yard Litigation, Selected Counsel for the Beneficiaries and their counsel, the Special Advisor to the Bankruptcy Court, plaintiffs and claimants' attorneys known to the Trust, and the Property Damage Trust. The Trust is further directed to instruct its local counsel to bring this Order to the attention of state and federal judges before whom the Trust is appearing as a party in pending litigation.

So ordered.

Dated: Brooklyn and New York,
New York
November 6, 1990

---
Jack B. Weinstein
United States District Judge

---
Burton R. Lifland
Chief Judge
United States Bankruptcy
Court of the Southern
District of New York

APPENDIX B

SPECIAL MASTER'S REPORT

TO THE HONORABLE JACK B.
WEINSTEIN:

The Manville Personal Injury Settlement Trust, a defendant in the above cases and many others, has moved for certification of a plaintiffs' class pursuant to Fed.R.Civ.P. 23(b)(1)(B). To assist in the making of findings essential for determining the motion, the Court, by order dated September 18, 1990, appointed the undersigned to hear and report "as expeditiously as possible on the following matters and any related issues:

"(1) Whether the financial assets of the Trust are so limited that there exists substantial risk that payment for the present and prospective asbestos-related personal injury and wrongful death claims brought against the Trust will be placed in jeopardy.

"(2) Whether 'there is a substantial probability—that is less than a preponderance but more than a mere possibility—that if damages are awarded, the claims of earlier litigants would exhaust' the defendant's available and projected assets, including any pertinent insurance proceeds. In re 'Agent Orange' Product Liability Litigation, 100 F.R.D. 718, 726 (E.D.N.Y.1983), mandamus denied sub nom. In re Diamond Shamrock Chemical[s] Co., 725 F.2d 858 (2d Cir.), cert. denied, 465 U.S. 1067 [104 S.Ct. 1417, 79 L.Ed.2d 743] (1984)."

In addition, the order said: "The Special Master is not limited to the criteria set forth in these two issues if he believes alternative formulations warrant consideration."

Following widely distributed notices by the movant to counsel for numerous plaintiffs and a number of codefendants, an initial hearing was held on October 3, 1990, for purposes of scheduling, initially exploring the issues and proposed procedures, and identifying the prospective participants. No limits were found necessary at that initial stage on the number of counsel or others who might appear. That situation did not change. All who expressed a desire to appear and participate have been heard, both for plaintiffs and for codefendants. With some assistance from the special master, discovery requests were handled by agreement of counsel, and the Trust produced a substantial volume of documents. We held four days of evidentiary hearings and thereafter met with counsel for oral discussions. Useful briefs and reply briefs were filed by three sets of counsel.

It emerges clearly from the foregoing efforts that the two questions referred by the Court call without a doubt for affirmative answers. There is, as things turn out, no meaningful disagreement on this score among the parties appearing and participating in these proceedings. While questions of interest have been contested, it is common ground that (1) the Trust's assets are so limited that payment for the asbestos claims embraced in the Court's questions are in jeopardy and (2) there is a " 'substantial probability ... that if damages are awarded, the claims of earlier litigants [will] exhaust' the [Trust's] available and projected assets...." The contentions and the proposed findings resulting in these conclusions are as follows.

I. As to the Trust—Briefly

Familiar to the Court, and lately taught to the special master, the nature and the history of the Trust need no recitation here. It suffices to recall that this entity was created out of the Chapter 11 filing of

Johns–Manville Corporation; that it was funded with cash, 50% of the Corporation's common shares, preferred shares convertible to another 30% of the common (so that the parties have treated the Trust as an 80% owner), bonds, and anticipated profits of the Corporation, all further detailed below; and that it became fully operative only recently, as these things go, on November 28, 1988 (the "Consummation Date"). The arrangement, too simply but adequately stated for present purposes, was that the Corporation would continue functioning, insulated, it might be said, from the voluminous asbestos claims, with the claimants to look to the Trust assets for their recoveries.

In key words of the Reorganization Plan, conveying a complex of readily stated if not easily reconcilable obligations, the Trust was to use its assets "to deliver fair, adequate and equitable compensation to bona fide Beneficiaries, whether presently known or unknown, without overpaying or underpaying any claims and with settlement to be preferred over arbitration, arbitration to be preferred over resort to the tort system, and fair and efficient resolution of claims to be preferred over all else...." (Plan and Related Documents, p. C–80.) The dual roles of trust and stand-in for a tort defendant have comprised some of the many perplexities attending the operation of this entity.

While there was never a warranty that the Trust would fairly and finally settle asbestos claims against the Corporation, seemingly careful estimates, subject to intensely interested scrutiny, offered substantial reason to foresee that desired consummation. The projections have been confounded, however, by rapidly unfolding events. The number of claims, the costs of settlement, and the Trust's litigation and administrative expenses have all exceeded the forecasts by wide margins. The Trust found itself as of September 30, 1990, after setting aside reserves for indemnification of Trustees and Officers, operational expenses and defense litigation expenses, with $26 million available for payment of $76 million in estimated liabilities through March 31, 1991, and with only nominal interest receipts due before August 31, 1991, when Manville is scheduled to make the first of two $37.5 million payments due in 1991. But this state of illiquidity was the least of the Trust's troubles—as seen by the Trustees, its counsel, and now all who have appeared in these proceedings. It had become apparent that without drastic changes affecting key aspects of its functioning, the Trust would run out of money while there remained unpaid a substantial volume of the claims the Trust exists to satisfy. The motion to declare a limited fund under Rule 23(b)(1)(B) followed.

## II. The Participants and Their Positions

While a number of other attorneys and interested parties have appeared from time to time and offered brief statements of their views,[1] three parties or groups have

---

1. Submissions were received from Walter Umphrey of the firm of Umphrey, Eddins & Carver; Richard S. Glasser of Glasser & Glasser joined by Robert R. Hatten of Patten, Wornom & Watkins; Joseph D. Shein of Joseph D. Shein, P.C.; David Gertler of Gertler, Gertler & Vincent; Joseph M. Bruno of Bruno & Bruno; Robert E. Sweeney of Robert E. Sweeney Co., L.P.A.; Miles O'Malley of the National Asbestos Victims Legal Action Organizing Committee; and Maurice C. Doolen, who filed an "In Pro Se Joinder and Consent to Determination of Limited Funds."

Messrs. Umphrey, Glasser, Hatten, Bruno and Gertler do not take a position as to whether the Trust has a limited fund for the purpose of Rule 23(b)(1)(B). They are concerned about the impact of class certification on their clients, who have liquidated but unpaid settlements with the

Trust and/or consent judgment orders. They argue that the settlements or judgments should be paid in full regardless of whether a class is certified. Messrs. Glasser and Hatten argue that the special master has no authority to set aside or disturb such agreements. Mr. Umphrey requests inclusion of the settled values as liabilities and incorporation of a description of the *Cimino Settlement Agreement* of July 1990 in the Eastern District of Texas in this report. (The Settlement Agreement is in the record as P.Ex. M.) Without undertaking a determination as to their handling in the event a class is certified, we have treated liquidated but unpaid settlements as liabilities of the Trust for the purpose of this report.

Mr. Sweeney opposes the Trust's motion on the ground that the Trust "cannot invoke the Court's jurisdiction to overturn it [the Plan] or to trans-

participated continuously in the presentation of evidence and arguments concerning the findings and conclusions to be comprised in this report:

(1) The Trust, as movant, represented by its General Counsel, David T. Austern, and the firm of Wachtell, Lipton, Rosen & Katz, with Theodore Gewertz and Douglas K. Mayer of counsel.

(2) Counsel for the Plaintiffs' Negotiating Committee, represented by the firm of Caplin & Drysdale, Chartered, with Elihu Inselbuch, C. Sanders McNew and William L. Norine, together with a group of plaintiffs, represented by Gene Locks of the firm of Greitzer & Locks, the latter having taken part in the evidentiary hearings but not in the preparation of briefs.

(3) Codefendant Owens–Corning Fiberglas, represented by the firms of Debevoise & Plimpton (with Anne E. Cohen and Geoffrey H. Coll of counsel) and Christy & Viener (with Wayne C. Matus of counsel).

As noted earlier, the positions of the three differ in respects that will or may become material at some point and are of some secondary consequence right now, but not with respect to the referred questions going to the propriety of a [Rule] 23(b)(1)(B) class. Bearing in mind that the Court's concerns in this difficult situation are likely to transcend the essentially undisputed conclusions reached herein, we review briefly the major points at which the parties diverge.

### The Trust's Position

The Trust, as movant and repository of the essential information, has produced voluminous documents and the only witnesses who appeared at the hearings. (It should be noted, though, that the Trust's General Counsel, David T. Austern, and its Executive Director, Marianna Smith, were not initially tendered as witnesses by the Trust but appeared at the request of the Plaintiffs' Negotiating Committee.) The factual basis for the other parties' contentions comes from the Trust's own materials and cross-examination of its witnesses.

Based upon undisputed documentary evidence and the expertise of its investment banking consultant, but subject to debatable premises developed on cross-examination by the other parties, the Trust computed its total assets as of June 30, 1990, at a range between $1.264 billion and $1.463 billion if its Manville common shares are valued at market price, specifically the $5.75 per share taken for this purpose at the time of the initial submission.[2] Alternatively, taking a price of $15.09 per share as a hypothetical premium value for the control of Manville, the range becomes $2.152 to $2.351 billion. The other components of these ranges are cash of $126 million, bonds valued at $449 to $512 million and future profit-sharing valued at $137 to $273 million.

As against the maximum of $2.351 billion in assets, the Trust computes its liabilities for asbestos claims at over $7 billion, made up of the following:

| | |
|---|---|
| Unliquidated Claims on File | $4.794 billion |
| Unpaid Settlements | .434 billion |
| 47,000 Future Claims | 1.840 billion |
| Total | $7.068 billion [3] |

The enormous gap between assets and liabilities thus asserted has been the subject of much argument and analysis tending to increase or diminish the resulting jeopardy. The Trust points out, for example, that these numbers contain no provision for anticipated defense costs and ex-

---

form it into something other than that accepted by Claimants." The objection is beyond the scope of this reference. Mr. Sweeney also objects to the motion on the ground that the Trust is not facing insolvency, but is merely facing an anticipated delay in payments.

Mr. Shein submitted a so-called Demand for an Offer of Proof, which served no purpose.

Mr. O'Malley made a written submission and read his position into the record. He did not object to a limited fund finding, but suggested that it might be more appropriate to liquidate Manville and distribute the proceeds to asbestos-health victims. He also criticized the Trust and the plaintiffs' attorneys, asserting they have failed to keep the plaintiffs' interest paramount.

**2.** Closer to the present, the price had fallen to $4.62 per share on October 25, 1990.

**3.** The liabilities do not include $14.5 million in verdicts against the Trust as of October 1, 1990.

penses of administration—which are running, respectively, at the rate of $45–50 million and $20 million per year. On the other side, as will appear, there are arguments that the liabilities may be overestimated and should be reduced to present values because of the prospect that payment will extend far into the future. Varying in substance, these arguments leave undisputed the essential conclusion that unless the present course is altered in significant respects, the Trust will fail in its purpose to compensate fairly all of its present and prospective beneficiaries.

Owens–Corning Fiberglas's Contentions

Owens–Corning Fiberglas ("OCF") agrees that there is a limited fund, but argues that it is less limited than the Trust contends. According to OCF, the Trust both understates its assets and overestimates its liabilities. The assets, OCF submits, are worth about $3 billion. Moreover, if the Trustees effected a leveraged buyout of the Manville minority stock interest, the Trust could have income of $150 million or more per year. As for the liabilities, OCF urges on a series of grounds that the Trust's estimate "could be lowered by, at the very least, 7 to 12 percent." (Post–Hearing Memorandum 4.)

Among its detailed criticisms respecting the assets, OCF argues that the so-called "low range," appraising the 80 percent Manville stock interest at market price, is "[a]stonishingly" unsuitable since it leaves out of account the obvious premium value of a controlling interest. It is unnecessary to stay long over this, however; the Trust has proposed a higher range, including a premium, that adequately vindicates its position on the pending motion even while it points out the probable dearth at present of

any bidders for Manville appearing to offer that premium.

OCF submits in addition a number of arguable criticisms of the Trust's expert's appraisal of other asset values including the basis for calculating the control premium and the valuation of the Trust's profit-sharing interest. Since the upshot in OCF's view is a total asset value not much above $3 billion, and since this total does not approach remotely the undisputed range of asbestos claims liabilities, these additional criticisms become inconsequential details for the purposes of this report.[4]

On the subject of the Trust's estimated asbestos claims liabilities, OCF has made a number of serious and interesting criticisms that may prove to be matters of importance before this web of human misery and financial puzzlement is finally untangled. While, again, these points do not affect the outcome of this report, they merit some note and comment.

At the center of the Trust's premises in computing the unliquidated asbestos claims is a statistical model developed by the Resource Planning Corporation ("RPC"). The model, based on multiple regression theory, posits that aggregate settlement values can be predicted from the claimants' proofs of claim ("POC") by extrapolation from four factors in the POC: the alleged injury, claimant's age, whether the claimant is living, and the jurisdiction in which the claim is lodged. Whatever doubts the model might generate *a priori*, it has strong credentials in demonstrations of apparent reliability when tested against settlements of both pre-petition and post-petition claims. There are, nevertheless, cogent questions raised by OCF.

---

**4.** One further point pressed by OCF bears mention in connection with the Trust assets even though this line of argument seems to lead nowhere for the moment. OCF advises, and it is undisputed, that the Trust's managers, with expert investment banking advice, have given serious thought in the past to a leveraged buyout of the 20 percent minority interest in Manville. The relevant calculations indicate that such a transaction might have realized for the Trust an initial income of $150 million annually, increasing with improvements in Manville's prospects.

Among the sufficient answers for the moment are: (1) that an LBO does not appear to be a viable option at this time, and (2) that even if it were, the possibility of going that route cannot serve to alter the affirmative answers to the Court's questions related to Rule 23(b)(1)(B). Accordingly, while this subject merits recordation, it has not seemed worthwhile to explore now whether the Trustees would be either well advised or empowered to seek ownership of Manville by means of an LBO.

In its nature the RPC model continues to be an effective predictor if the history it has accurately foretold continues substantially unchanged. But the historical course is altering, OCF notes. And that appears to be true. The rate of serious disease claims is declining. In addition, there is an increasing proportion of settlements based on less serious disease determinations than those alleged in the POCs. Within disease categories, the severity of the afflictions has been tending to decrease. Further, as the mix of claimants' occupations has changed (e.g., from relatively severe exposures as in cases of shipyard workers to less severe cases like those of tireworkers), while it is not one of the four RPC factors, this too tends to decrease settlement values.

On the other hand, the maze of imponderables includes factors working in the other direction. Prominent among these is the fact that the Trust's straitened cash position has made it impossible either to settle cases speedily and in large numbers or to pay the settlement values for periods of years. The result is the discouragement of settlement and the increasing pressure of plaintiffs and their counsel to move cases on for trial. Reliable general experience and the asbestos history predict accurately that settlements on the courthouse steps are steeper, jury verdicts riskier and the total cost of litigated cases higher on average. Inflation, both general and specifically in costs of medical care, is also a factor, if not a major one, pushing toward costlier settlements.

It is not seriously disputed that (1) the RPC model may omit materially causal factors, (2) the weight of those factors is changing in a direction that would seem to render the model's predictions excessive and (3) other events are obtruding that tend to raise settlement values and impair the model's reliability in the opposite direction. Nobody has suggested, however, any way to net out these opposing forces, and it is by no means shown that the model should be abandoned. Indeed, it is bemusing but possibly significant that the only ultimately relevant evidence in the nature of a test seems to indicate the continued utility of the model; applied to 8,000 primarily post-Consummation cases, it foretold an aggregate settlement value of $400 million as against an actual aggregate of $417 million, an *undervaluation* of $17,-000,000 or 4 percent. That seems to suggest that the model, if it moves only in mysterious ways, remains the best predictor we have. More certainly, it cautions against deciding that we should forecast settlement values *lower* than the model predicts until or unless some better tool is found.

OCF opens another perplexing subject when it stresses that average payments to claimants by the Trust have more than doubled those prior to the Chapter 11 filing. The Trust has offered nothing resembling a complete explanation for the contrast. It does present one exquisitely challenging and seemingly relevant factor that beckons the legal imagination, namely, that it is a *trust* and the plaintiff-claimants are its beneficiaries. Musing on this seeming paradox, the Trust's Executive Director permitted herself to recall with a glow that she earned an "A" in her law school Trusts course (Tr. 463), and that the chancellor's prescriptions remain vivid for her. It will be recalled in any event that the Chapter 11 Plan, perhaps superfluously, enjoins upon the Trust duties of fair and equitable treatment of the beneficiaries. How or whether these duties may be harmonized with the orthodox stance of the hard-bargaining defendant in tort cases triggers a complex of questions that none of the parties in this proceeding undertook to answer. Nor did anyone suggest that the Trustees have misbehaved in this respect or that the defendant/fiduciary quandary can or should affect the outcome of the inquiry ordered by the Court's reference in this proceeding. There was only the suggestion, potentially a cogent one, that this problem will be one to revisit when any restructuring or other modifications are approached at some future time.

Similarly for the future, and thus calling for no extended discussion here, are other doubts raised by the Trust's past practices—the handling of cases where claimants were Manville employees normally consigned to workers' compensation remedies,

the supposed threat of punitive damages as a settlement factor as against the Plan's seeming proscription of such damages for post-filing claims (Plan § 3.4, p. C–25), and the Trust's appraisal of other disputed factors that affect its settlement stance. Once more, these are concerns that bear on how the Trust came to its present condition, perhaps calling for and capable of modification, but not material to the question whether the Trust's limited assets now require, as they do, affirmative responses to the Court's questions.

It bears some emphasis, however, that counsel have seen fit—and have been permitted to a considerable degree—to make a record looking beyond the precise terms of the reference to concerns that will presumably engage court and counsel not too far down the road from here. One further matter in this category should be mentioned—the matter of attorneys' fees. The plaintiffs and the Plaintiffs' Negotiating Committee found it appropriate to explore the reasons for the substantial amounts of the Trust's money that have been and are being spent for outside defense counsel. These expenditures, based upon negotiated hourly rates charged by a number of law firms across the country, came to $13,658,452 for 1989, are expected to total $45–50 million in 1990, and show no signs of diminishing in the foreseeable future if the Trust's functioning continues without change.

The Trust's General Counsel, far from minimizing these costs for outside counsel, underscored that the full picture also includes that the Trust uses the full time of four in-house lawyers and half the time of a fifth to track or otherwise deal with litigation. Supplementing this account, the General Counsel reported anecdotal information indicating that somewhere between 33 and 50 percent of the Trust funds paid out in settlements or for judgments have been going for *plaintiffs'* attorneys' fees (Tr. 492–95). (See also Tr. 781–84, testimony of Marianna Smith.) In discussion with the special master, counsel for plaintiffs and the Plaintiffs' Negotiating Committee questioned both the reliability and the relevancy of these reports about plaintiffs' attorneys' fees. It was suggested that these counsel, who had at other points pursued subjects of potential interest for "restructuring," were in a position to supply accurate information about the amounts going from the Trust for fees of plaintiffs' attorneys. Their response to the invitation was a letter to the special master stating: "We adhere to the view that issues involving the contractual relationships between claimants as beneficiaries of the Trust and their counsel are irrelevant to any subject before you pursuant to the reference. Accordingly, we will offer no evidence on this subject."

Contentions of Plaintiffs' Negotiating Committee

On subjects other than their counsel fees, counsel for the Plaintiffs' Negotiating Committee ("PNC") participated vigorously and helpfully. Like OCF, they concur in the Trust's ultimate position but differ on the dimensions of the Trust's shortfall. In addition, preserving an issue that may be important at some other time and place, the PNC reviews cases on the standards and burden of proof applicable to a Rule 23(b)(1)(B) determination.[5]

For the assessment of the Trust's assets and liabilities, the PNC proposes that in the circumstances of this case the special master should adopt a method of "valuing the assets and liabilities that errs on the conservative side, to ensure that his conclusions are beyond reproach." (Post–Hearing Memo 2–3.) Elaborating that thesis, the PNC submits computations "assigning the lowest conceivable values to the Trust's liabilities and the highest possible values to

---

**5.** Citing learning from the referring Court's decisions and elsewhere, the PNC urges a test of "likely insolvency" to be demonstrated by clear and convincing evidence. If it were necessary to come to grips with this position, it would be rejected on the ground that it deviates from the terms of the Court's reference, which assigns questions of "substantial risk" and "substantial probability." The matter is largely academic, however. The proposed findings and conclusions in this report, leading to the result sought by the movant, are reached on the basis of evidence that is in its essential respects entirely clear, wholly convincing and ultimately undisputed in the dispositive sense that there is a limited fund creating the kind of "risk" for which Rule 23(b)(1)(B) provides.

its assets." (*Id.* at 7.) It may be questioned whether this is fairly labeled a "conservative" approach, or even how it serves to escape "reproach," when the "risk" to be assessed is a danger that the liabilities to asbestos claimants may go unpaid. Certainly from the viewpoint of such claimants, presumably central in the PNC's thoughts, it is doubtful that they would want their demands minimized and the estimated provisions for their payment maximized. This too may be passed since the PNC joins in the conclusion that the "Trust is a limited fund for the purposes of Rule 23(b)(1)(B)" (*id.* at 1). But some of the PNC's thoughts en route to this conclusion have helped to test the other submissions and ultimately to buttress the shared view on the outcome.

Alone among the participants the PNC raises a question respecting the $434 million in already settled but unpaid claims; since the claimants are evidently slated as of now to wait years for payment, this number should be reduced, says the PNC, to its "present value," which "may be as low as $150,000,000." (*Id.* at 8–9.) The thought has some immediate plausibility. In the end, however, its main service is to underscore the troubles of the Trust and the dimensions of the claimants' risk. Nobody has in fact wished to agree, or meaningfully agreed, to postpone payment of the settlements. They ought to have been paid before now. The postponements happen because the Trust is in a relevant sense broke. How broke it is, and how much in need of fixing, is probably best stated in terms of (1) what its present liabilities are and (2) the present value of the available assets. Even this is neither perfect nor decreed from on high. It is a better measure, however, than accepting the Trust's defaults as given and basing the limited fund calculations on that.

The PNC, pursuing its definition of what is "conservative," suggests that the 129,-254 unliquidated claims be dealt with for the sake of argument by appraising them all at "the lowest compensable claim value" of $22,951, producing a total value of $2,966,508,554 (*id.* at 11, 13). Then, criticizing the Trust's unquestionably imperfect effort to estimate future claims, the PNC would substitute the "unrealistic" alternative of allowing for no future claims at all (*id.* at 11–12). Similarly, because there is once more an inevitable element of uncertainty, it is suggested that future administrative and legal expenses should likewise be reduced to zero, eliminating a probable burden of some $60–70 million per year.

The PNC tenders similar exercises on the asset side, valuing the Manville stock "as optimistically as possible" (*id.* at 15) and likewise attaching maximum value to the Trust's interest in Manville's profits, arriving by such means at a total asset value of $2,883,999,000 as against the Trust's highest estimate of $2.35 billion. The difference is not a bagatelle, but it is without significance for present purposes.

The primary benefit of the PNC's permutations has been, as noted earlier, to buttress the shared position on the pending motion. Measured against the admittedly "unrealistic" hypotheses of the PNC and the closer critique of OCF, the Trust's calculations emerge as responsible projections. This appraisal is reinforced by the impressions made by the Trust's witnesses, who came across as earnest and knowledgeable. As the Trust's able Assistant CFO–Treasurer was not the last to acknowledge, the estimates and forecasts with which we are dealing are steeped in uncertainty. Projections of billions to the last dollar are the work of fallible minds doing the best they can. The reassuring aspect of the present assignment is that all the estimates lead to a single, agreed result.

### III. *Findings and Conclusions*

To summarize and restate them, the findings and conclusions recommended for the Court's approval are as follows:

1. Without pretending to certainties beyond what the nature of the facts allows, it is reasonable to say, and it is found, that the Trust's assets have a value in the range of $2.1 to $2.7 billion.

2. On a similar basis, the Trust's liabilities for asbestos claims already pending and unliquidated, together with an estimated 47,000 further claims to be received in the future, come to a total of $6.5 billion.

In addition, the Trust owes $448.5 million for claims that have been liquidated by settlement or judgment.

3. If it could fulfill its obligations in the interests of the claimant beneficiaries, the Trust would pay promptly the $448.5 million owed for liquidated claims. The Trust lacks the cash, however, to pay more than an inconsequential portion of this amount.

4. However insolvency is defined, the Trust is deeply insolvent.

5. The Trust's assets and expectations of future receipts are and will be so limited that there is a substantial risk that payments for present and prospective asbestos-related claims for personal injury and wrongful death will be in jeopardy.

6. There is a substantial probability that the award of damages to earlier litigants will exhaust the Trust's available and projected assets.

7. The foregoing findings and conclusions, inasmuch as they supply affirmative answers to the Court's questions, are reached upon the basis of evidence that is clear and convincing to the point of being undisputed and beyond dispute in all essential respects.

Respectfully submitted,

Marvin E. Frankel
Special Master

Dated: New York, New York
November 3, 1990

## APPENDIX C

### STIPULATION OF SETTLEMENT

WHEREAS, the Manville Personal Injury Settlement Trust (the "Trust") was established pursuant to a Trust Agreement dated as of November 28, 1988, which is Exhibit C to the Second Amended and Restated Plan of Reorganization of the Johns–Manville Corporation, *et al.* (the "Plan"), which Plan was confirmed pursuant to 11 U.S.C. § 1129; and

WHEREAS, pursuant to the Plan and Trust Agreement the Trust assumed all existing and future liabilities for all AH Claims and Other Asbestos Obligations and all persons having such claims are Beneficiaries of the Trust; and

WHEREAS, plaintiffs have commenced the above-entitled action as a class action on behalf of all Beneficiaries of the Trust seeking an equitable distribution of the assets of the Trust among all of the Beneficiaries of the Trust; and

WHEREAS, there are presently approximately 130,000 claims by Beneficiaries pending against the Trust and many more claims are expected to be filed and the assets of the Trust are not and will not in the future be sufficient to pay all claims in full as they are liquidated; and

WHEREAS, unless the Trust is restructured, it is likely that

(i) its assets will be dissipated at substantially less than their fair value;

(ii) enormous sums of money will be spent on defense costs which could and should otherwise be allocated to the payment of Beneficiaries; and

(iii) certain Beneficiaries will receive a disproportionately large payment on their claims in comparison to other Beneficiaries while some Beneficiaries will receive far less than is equitable or nothing at all; and

WHEREAS, in order to maximize the value of the assets of the Trust, it is necessary that the Manville Corporation function and prosper as a going business. The continued uncertainty and risk engendered by the present status of the Trust has caused harm to the business and financial condition of the Manville Corporation and thus further threatens the value of the assets of the Trust to the detriment of its Beneficiaries; and

WHEREAS, the assets of the Trust constitute a "limited fund" for the purposes of Federal Rule of Civil Procedure 23(b)(1)(B).

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among the undersigned, that all claims of the Class (as defined below) shall be settled and compromised subject to the approval of the district court and pursuant to Rule 23(e) of the Federal Rules of Civil Procedure upon and subject to the terms and conditions set forth below:

### General Provisions

1. Unless otherwise specified herein, all capitalized terms employed herein and not otherwise defined herein shall have the meanings set forth in the Glossary which is a part of Exhibit B to this Stipulation.

2. This Stipulation is binding upon each member of the class of plaintiffs in this action (the "Class"). The Class consists of all Beneficiaries of the Trust, including, but not limited to, all persons who presently have or may in the future have (a) any unliquidated claim for death or personal injury arising from exposure to asbestos and arising or allegedly arising, directly or indirectly from acts or omissions of the Manville Corporation or any of its predecessors, subsidiaries or affiliates; (b) any warranty, guarantee, indemnification or contribution claims against the Trust arising directly or indirectly from exposure to asbestos by any member of the Class; and (c) settlements or judgments arising from any of the foregoing claims previously asserted against the Trust. Each claim of a Beneficiary against the Trust, including without limitation the claims comprised by (a), (b) and (c) above, constitutes a "Trust Claim".

3. In the event of any inconsistency between the provisions of this Stipulation and of the Plan, the Trust Agreement and any exhibits or annexes thereto, the provisions of this Stipulation will govern. The settlement of the rights of Beneficiaries against the Trust effected by this Stipulation does not otherwise affect any provision of the Plan or any document entered into in connection therewith.

4. In order to effectuate the provisions of this Stipulation and to protect the interest of the Beneficiaries, the Trust and Manville Corporation have entered into the agreements annexed hereto as Exhibit B. Exhibit B is hereby made a part of this Stipulation as if expressly set forth herein.

5. In addition to the provisions of Sections 5.04, 5.06 and 5.07 of the Trust Agreement, no Trustee, officer, employee or agent of the Trust shall be liable to the Trust, any Beneficiary or any other person or entity as a result of any action or inaction of the Trust (including without limitation any action or inaction of any of its Trustees, officers, employees and agents) if such Trustee, officer, employee or agent in good faith believed that such action or inaction was authorized by the terms of this Stipulation and the Exhibits hereto, or if the judgment or decision upon which such action or inaction was based was arrived at in good faith.

6. This Stipulation is expressly conditioned upon the entry of a Final Order approving the actions of the Trustees in causing the Trust to commence the Limited Fund Proceeding, approving the settlement of the Class Action Lawsuit on terms and conditions satisfactory to the class representatives and the Trustees, and authorizing and approving the execution, delivery and performance by the Trustees and the Trust of this Stipulation, the exhibits hereto, the agreements and actions contemplated herein and therein and all other documents and agreements necessary to effectuate the settlement.

7. Without limiting the terms of the preceding paragraph, this Stipulation is expressly conditioned upon the entry of a Final Order finding that the named representatives of the Class fairly and adequately represent the interests of the Class, and that the Class Action Lawsuit otherwise complies with the provisions of Rule 23 of the Federal Rules of Civil Procedure.

8. Except as provided in paragraph 9 herein, the rights and duties of all Class members and the rights and duties of the Trust and Trustees with respect to Class members shall be governed by Exhibit A annexed hereto which is incorporated into this Stipulation, the Trust Claims of Class members shall receive payment only as provided in Exhibit A, and such payments shall constitute complete satisfaction by the Trust of such claims.

9. A "Liquidated Claim" shall be any Trust Claim that, as of the date hereof, is the subject of a Final Order or judgment or a valid and binding contract. From and after the date that the Settlement Order becomes a Final Order, unless the holder of any Liquidated Claim shall elect to be treat-

ed pursuant to the provisions of Exhibit A hereto, such election having been made by written notice to the Trust no later than 120 days following that date, Liquidated Claims shall be paid in accordance with their terms, provided, however, that (i) any amounts immediately due and owing as of the date of such Final Order in respect of any Liquidated Claim shall be paid within 10 days after the payment of the First Dividend (as defined in the Master Agreement) without any acceleration or accrual of interest; and (ii) in the event that any Class member holds both a valid and binding contract and a judgment the terms of his contract shall govern.

10. If the district court approves the settlement embodied in this Stipulation, a Final Judgment of Dismissal shall be entered substantially in the form of Exhibit C hereto.

Dated:   New York, New York
      November 19, 1990

      David T. Austern
      General Counsel
      MANVILLE PERSONAL INJU-
        RY SETTLEMENT TRUST
      1825 Eye Street, N.W.
      Washington, D.C. 20006

      David T. Austern
      Attorney for Defendants

      NESS, MOTLEY, LOADHOLT,
        RICHARDSON & POOLE,
        P.C.
      151 Meeting Street, Suite 600
      P.O. Box 1137
      Charleston, S.C. 29402

      CARTWRIGHT,    SLOBODIN,
        BOKELMAN,   BOROWSKY,
        WARTNICK,   MOOTE  &
        HARRIS, INC.
      101 California Street, 26th Floor
      San Francisco, California 94111

WILENTZ GOLDMAN SPIT-
  ZER
90 Woodbridge Center Drive
P.O. Box 10
Woodbridge, New Jersey 07095

BARON & BUDD
8333 Douglas Avenue
10th Floor
Dallas, Texas 75225

ROSE, KLEIN & MARIAS
801 South Grand Avenue
Los Angeles, California 90017
By: /s/ Robert B. Steinberg
Robert B. Steinberg

Attorneys for Plaintiffs

### TRUST DISTRIBUTION PROCESS

Exhibit A to the Settlement Agreement*

A.  *Ordering of Claims and Payments.*

**Overview.** The ultimate goal of the proposed plan is to treat all claimants alike by paying all claimants an equal percentage of their claims' values over time. However, the timing of payments will be structured to pay the most seriously-injured claimants first. Initially, then, the most seriously-injured claimants will receive all the Trust's assets available for distribution. Later, first payments to seriously-injured claimants will be the same percentage of liquidated value as payments in the first year but in all other aspects the claims will be paid on a pro rata system, without regard to the severity of the claimants' injuries. Once claimants receive 45% of their liquidated values, they will stop receiving payments until all other claimants receive 45% of their liquidated values. Thereafter, payments will be pro rata to all claimants until they receive their full liquidated value.

Predictions of the number of future claims and their severity and of values to be achieved for Trust assets remain difficult to make with precision, so no guaranty of any specific level of payment can be made.

**Two levels of claims.** Each claim will be placed in one of two levels for purposes of

\* Editor's Note: Exhibits B and C are omitted    from publication by the Court.

scheduling the timing of liquidation and entry into the payment pool. The most seriously-injured claimants will be placed in Level One. Level One will include: (i) all claims for asbestos-related cancers; (ii) serious asbestosis cases, i.e., those of a sufficient severity to justify treatment with cancer cases;[1] and (iii) claims for death substantially caused by an asbestos-related disease. Level Two will include all other asbestos health claims. Contribution and indemnification claims will be classified according to the injury in the underlying personal injury/death claim. The Trust's decision as to whether or not a claim is eligible to be included in Level One or whether or not a claim is entitled to preference in processing or payment will not be reviewable except when the claim is reached in the ordinary course of processing and then in arbitration as described in C below.

**Level One claims.** For the first two payment cycles through the payment pool, only Level One claimants whose claims have been liquidated—i.e., those who have accepted the Trust's valuation of their claims, or have established their value through arbitration or trial—will receive payments from the Trust. The Trust will begin to liquidate Level One claims as soon as practicable after an initial agreement on the restructuring plan is reached and approved by the court so that, by the time any appeals have concluded, many if not all Level One claims filed will have been liquidated. In any event, the Trust shall offer to liquidate and make an initial payment to all such Level One claims in one of the two first payment cycles through the payment pool. Level One claims filed after any appeals have been concluded will be processed by the Trust and, if liquidated, will receive an initial payment no later than the second payment cycle through the payment pool after the date of filing. Level One

claims will be paid in the following order: (i) claimants who fall under the Trust's present extreme hardship and exigent health standards (ignoring trial docket status which is no longer relevant); (ii) living cancer claimants; and (iii) the remainder in FIFO order. Claims will be processed in this order, except the Trust may process and liquidate groups of cases whatever the order of individual cases within the group.

**Level Two claims.** The Trust will begin to pay liquidated Level Two claims in the third payment cycle from the payment pool. Level Two claims will be paid in the following order: (i) hardship cases; (ii) claimants with (a) radiographical evidence of bilateral pleural encasement or at least mild bilateral interstitial fibrosis (e.g., ILO reading of at least 1/0) and (b) either forced vital capacity, or total lung capacity or diffusion below 70% of predicted, with asbestos being a substantial contributing factor to same; (iii) claims of living claimants over 70 years of age; and (iv) the remainder in FIFO order. Claims will be processed in this order, except the Trust may process and liquidate groups of cases whatever the order of individual cases within the group.

**Extreme Hardship and Exigent Health Claims.** Notwithstanding anything contained herein, the Trust may liquidate and pay Level One extreme hardship and exigent health claims to the extent that Trust funds permit. With the commencement of the third payment cycle from the payment pool, the Trust may begin to liquidate and pay Level Two extreme hardship claims as well. Any advance payments shall be credited against payments which such claimants shall receive from the payment pool and shall be calculated so that they will not exceed the amount which the Trust reasonably anticipates the claimant would receive in his/her initial payment from the pool.

---

1. For non-malignant disease to qualify for consideration as part of Level I, it must involve a claimant who (a) has died where asbestos disease was a substantial contributing factor to the death or (b) is unable to work, suffers from severe dyspnoea, is essentially housebound and sedentary, where asbestos disease is a substantial contributing factor to the disability, who provides:

(i) radiographical evidence of bilateral interstitial fibrosis of at least a moderate degree of severity (e.g., ILO greater than 2/1 or extensive bilateral pleural fibrosis) and

(ii) forced vital capacity, total lung capacity or diffusion below 50% of predicted, or

(iii) proof that the injury is rated as a Class IV Pulmonary Impairment under the guidelines of the American Medical Association.

**Progression.** Once the Trust has liquidated a claim, the claimant can reassert a further claim against the Trust only where (i) a Level Two claimant develops an asbestos-related cancer or Level One asbestosis, or (ii) a claimant who settled his claim as a Level One asbestosis claim develops an asbestos-related cancer. Such claimants will be permitted to refile claims against the Trust as Level One claimants for their additional damages. Amounts already received and to be received, if any, from the Trust for their already-liquidated, non-cancer claims will not be deducted as a set-off against their refiled claims for cancer. However, amounts already received and to be received for Level Two claims, shall be deducted as a set-off against their refiled claim for non-cancer Level One disease. Where a claimant has liquidated his claim against the Trust prior to the adoption of these procedures, any amounts paid or to be paid pursuant to such liquidation shall be set-off against the liquidated amount arrived at hereunder. A refiled claim shall be deemed filed as of the date of filing of the new claim.

## B. *Liquidation of claims with the Trust.*

**Categorization of claims.** A claim must present evidence of an asbestos-related injury resulting from exposure to Manville asbestos which will sustain a cause of action at common law. The Trust will categorize claims by disease and, within each disease category, by other factors affecting the claim's value. The categories and values for each disease will be defined by matters affecting the amount of damages (including without limitation age, jurisdictional history, Manville's relevant market share, living/dead (when claim filed), disability, dependency, special damages, pain and suffering), and evidence that these damages were (or were not) related to asbestos exposure (for example, alternative causes, strength of documentation of injuries).

**Claims valuation by category.** For each type of disease, the Trust, the Selected Counsel for the Beneficiaries and the Special Advisor to the Trust have together established a midpoint and maximum value for claims against the Trust based upon experienced settlement values for claims for that disease. A listing and explanation of the Levels and categories is annexed as Attachment A. In extraordinary cases—such as cases where a claimant was exposed only to Manville asbestos products or where Manville asbestos products constituted the overwhelming majority of the claimant's asbestos exposure, or where special damages are exceptionally large—claims may be valued for amounts that exceed the normal value range for any given disease category.

**Preliminary claims information.** Before a claim will be processed, the claimant must elect to proceed as a Level One or a Level Two claimant and, if as a Level Two claimant, whether to accept any deferral payment (discussed in Section G below) then offered by the Trust. The Trust will provide all claimants with a short form on which to make these elections.

**Supporting medical evidence.** The Trust will process and value claims by reference to the medical evidence already submitted to the Trust as part of the claimant's proof of claim. In addition to such medical evidence as claimants are required to submit, the Trust may require, with the concurrence of the Selected Counsel for the Beneficiaries after consultation with the Trust's Special Advisor, that additional kinds of medical evidence may be required. A claimant may, but need not, supplement this information with more current medical evidence. Where the claimant has filed an incomplete proof of claim, the Trust will notify the claimant of the missing information and need not process the claim until the file is complete.

In all cases, the Trust may require that medical x-rays, tests, laboratory examinations and other medical evidence comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable. The Trust may develop methods for auditing the reliability of medical evidence, including independent reading of x-rays. If its audits show an unacceptable level of reliability for medical evidence submitted

by specific doctors or medical facilities, the Trust can refuse to accept medical evidence from such doctors or facilities.

### C. *Resolution of disagreements over liquidation values.*

**Contestable Matters.** If a claim is for one of the types of diseases compensated under this agreement, and if the claim is supported by medical evidence, the Trust will not dispute the culpability of Manville's conduct, or, as a general proposition, that asbestos exposure caused such diseases.[2] Instead, the Trust will have the right to contest only the following matters:

—the type and seriousness of the claimant's injuries;

—the claimant's exposure to Manville asbestos products;

—other causation-in-fact issues;

—the amount of damages; and

—applicability of statutes of limitations to the extent the statute barred the claim as of October 1, 1990.

**Arbitration.** It is expected that even a flawless claims resolution procedure will formulate some claim valuations that do not fairly meet a claimant's perceived deserved valuation. Commencing when the order approving this agreement shall become final, in such instances, the Trust will provide claimants with a choice of mediation, binding arbitration or non-binding (as to the claimant) arbitration. The Trust's current arbitration and mediation procedures will provide starting points for these procedures subject to modification by the Trust with the concurrence of the Selected Counsel for the Beneficiaries, after consultation with the Special Advisor to the Trust.

In the event that an arbitral panel concludes that a Level 2 claim was eligible and should have been treated as a Level 1 claim, appropriate adjustment in the compensation shall be made so that the claimant will not have been prejudiced by the disposition.

Arbitral panels will return awards within the value limits set by the Trust for the disease category in which the claim properly falls, determine that the disease falls in a higher (or lower) category and determine an appropriate value, or, in truly extraordinary cases, return awards in excess of category limits. A claimant who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who had accepted the Trust's original valuation of the claim.

**Trials.** Only claimants who opt for non-binding arbitration and then reject their arbitration awards retain the right to trial of the liquidated value of their claims against the Trust. A judgment creditor will become eligible for payments from the Trust only upon the later of the date that the judgment is final and all appeals have been exhausted, or the date that the claim would have been paid as part of the ordinary scheduling process.

### D. *Creation of two pro rata pools.*

Prior to the sale of Manville stock, Trust claimants will be compensated through two "pro rata pools". A claimant who agrees to liquidate his or her claim for the amount offered by the Trust, or who accepts an arbitration award after binding or non-binding arbitration with the Trust, will enter Pool A in the amount of the liquidated value after the claim has been so liquidated with the Trust subject to the ordering process described in A above. A claimant who rejects the Trust's settlement offer, and an award in non-binding arbitration and who returns to the tort system and obtains a judgment for money damages will also enter Pool A after the claim has been reduced to a final judgment. The value of a judgment creditor's claim in Pool A, however, will not exceed (i) the upper limit for the disease category established by the Trust or by non-binding arbitration or (ii) such higher amount as may have been offered by the Trust or awarded through arbitration in an extraordinary case as described

---

2. The Trust, with the concurrence of the Selected Counsel for the Beneficiaries, after consultation with the Special Advisor to the Trust, shall jointly prepare a list which, subject to mutual revision, shall reflect the diseases.

in B above. Judgment creditors with verdicts in excess of these limits will also enter Pool B, where they may receive compensation for the excess amount of their verdicts.

### E. *Distribution of Trust funds between the pools.*

**Distribution of Funds.** The Trust's funds available for general distribution (after expenses and reserves) in any given year will be deposited in Pool A for distribution to liquidated Pool A claimants. Except as provided below in connection with distribution of large sums, these revenues will include all dividends, bond payments, proceeds from the monetization of the bonds and annual profit-sharing payments. Pool B will receive all revenues available in any year after all outstanding Pool A claims have been fully and completely satisfied.

**Distribution of Proceeds from Sale of Stock.** If and when the Trust sells any of its stock in Manville Corporation, up to and including its controlling interest, the Trust shall deposit the proceeds of sale into a principal account. The proceeds of sale are to be distributed over time in a manner which will equalize, as best as can be done, payment among all claimants: those whose claims have by then been liquidated, those whose claims have by then been filed but not yet liquidated, and those whose claims have not yet by then been filed. In doing this computation, account shall be taken for any further funds to be received by the Trust (such as expected proceeds from remaining interests in stock, bond payments or proceeds from bond monetization sales, or profits participation should they remain the property of the Trust). From time to time, the Trust with the concurrence of the Selected Counsel for the Beneficiaries, after consultation with the Special Advisor to the Trust, shall make a determination as to what pro rata share of payments can be made to all claimants given the Trust's total assets and shall allocate and retain in the principal account those funds necessary to provide that level of payments to unliquidated claims and unfiled future claims. The balance shall be available for distribution through Pool A to produce payments to this level for then liquidated claims. The Trust shall revisit the allocation annually and, with the concurrence of the Selected Counsel for the Beneficiaries, after consultation with the Special Advisor to the Trust, determine whether or not changes in the allocation can be made and additional funds be distributed from the principal account to Pool A.

**Distribution of Large Sums.** Similarly, if and when the Trust receives a large infusion of cash—for example, from the monetization of the bond or from any extraordinary dividend or other distribution from Manville Corporation—the Trust may limit distributions in each year to conserve Trust resources for claimants who are due payments in future years in a manner concurred in by Selected Counsel for the Beneficiaries after consultation with the Special Advisor to the Trust.

### F. *Payment of Claims.*

**Annual Payments Prior to Sale of Stock.** Until such time as the Trust sells its holdings in Manville stock, claimants will receive an annual payment from their respective pools. Within each pool, each claimant will receive an annual pro rata share of the Trust's funds available for distribution in that year. That share can be expressed by the following fraction:

$$\frac{\text{Unpaid balance of claimant's liquidated value}}{\text{Total unpaid balances of all liquidated values}}$$

Entry into the first annual Pool A shall be closed as of the date thirty days prior to the payment date for the first dividend if by that date at least two-thirds of all Level 1 malignancy claims on file with the Trust have been liquidated and are included in Pool A. In the event that by then the Trust will not have liquidated two-thirds of such malignancy claims, then the Pool will not be closed until the date that the Trust has liquidated two-thirds of the Level 1 malignancy claims that were on file on the date thirty days prior to the payment date for the first dividend. Payment of claims in the Pool shall be made within forty days after the first annual Pool A is closed.

The second payment through Pool A shall be closed thirty days before the payment date for the second dividend if by that date the number of Level 1 malignancy claims that has been liquidated by the Trust is equal to or greater than the number of such claims on file with the Trust on the date thirty days prior to the payment date for the first dividend. In the event that by then the Trust will not have liquidated such number of malignancy claims, then the Pool will not be closed until the date that such level of liquidation has been achieved. Payment to claims in the Pool shall be made within forty days after Pool A is closed.

The third and subsequent payments through Pool A shall be closed on the anniversary in each year of the close of the second Pool. Payment shall be made within forty days after the closure in each year.

All payments provided for hereunder shall be made to each claimant within the times specified so long as all necessary documents for the claimant shall have been exchanged. Otherwise, payments shall be made as part of monthly distributions as soon as practicable after all necessary documents have been exchanged for a particular claim.

Level One claimants who enter the pool after the first year will receive a first payment equivalent to what they would have received had they entered the pool during its first year.

Each claimant will receive annual distributions from the pool until such claimant has received 45% of such claimant's liquidated value. Such claimant will then receive no further payment unless and until all other claimants in the pool have received the same 45% of their liquidated values. Once all claimants in the pool have received 45% of their liquidated values, then all additional distributions from the pool shall be made pro rata to all claimants.

The Trust, with the concurrence of the Selected Counsel for the Beneficiaries, after consultation with the Special Advisor to the Trust, may adopt procedures for this distribution process designed to minimize the expenses of the Trust, its beneficiaries, and attorneys for its beneficiaries, as, for example, in consolidating a series of annual small payments.

**Payments Upon Sale of Manville Stock.** If the Trust has determined, with the concurrence of the Selected Counsel for the Beneficiaries, after consultation with the Special Advisor to the Trust, that there are sufficient funds available to pay at least 45% of their liquidated values to all present claims, whether already filed or liquidated or not, and future claims then distributions shall be made so as to make all total distributions pro rata among all claimants. In the event the Trust determines, with the concurrence of the Selected Counsel for the Beneficiaries, after consultation with the Special Advisor to the Trust, that there are insufficient funds to pay all claimants at least 45% of their liquidated values, then proceeds from the principal account paid into Pool A shall be distributed as follows:

(a) each liquidated Level One claimant who entered Pool A after the first year will receive a payment that will raise his payment level to the same level as Level One claimants who entered the pool in the first year have by then received; this payment will ensure that all Level One claimants will have received the same percentage of their liquidated values, regardless of the year in which they entered the pool;

(b) a similar distribution will be made to Level Two claimants, to ensure that they, too, have all received the same percentage of their liquidated values as have those Level Two claimants who first entered the pool; and

(c) remaining proceeds will be distributed pro rata to all claimants, regardless of level, until all Level One claimants have received 45% of their liquidated values; funds remaining will then be distributed pro rata to all Level Two claimants until they have received 45% of their liquidated values, with any further distribution pro rata to all claimants regardless of level.

There shall be no further proceeds paid into the pool and distributed to claimants in the pool unless and until a further distribu-

tion from the principal account shall be made in which event distribution shall be in accordance with paragraph (c) above.

If and when all claimants shall have received 100% of their liquidated values, any remainder in Pool A shall be deposited in Pool B.

**Payments After Sale of Stock.** The funds from the principal account shall be used to pay the claims of those claimants whose claims were not liquidated and placed in Pool A, with the claims to be liquidated in the same manner. Level One and Level Two claimants shall be paid in the same ratios as those paid from Pool A. Upon liquidation, the pro rata liquidated value shall be paid in full. From time to time, as described above, the Trust may determine that additional funds from the principal account may be distributed into Pool A. In the event that all claimants in Pool A and all later filed claims shall have been paid 100% of their liquidated values, and no claims shall have been filed for five years, then any remainder in the principal account will be deposited in Pool B.

G. *Deferral of Level Two claimants.*

Savings in litigation defense expenses realized by the Trust, if any, may be employed to fund deferral payments for some Level Two claims for three years beginning in the year after the year in which any appeals are concluded.

At the close of the Trust's first, second and third fiscal years, therefore, the Trust's actual litigation defense expenses will be compared to the amount of the Trust's litigation defense expenses for its fiscal year 1990. Any reduction in litigation defense expenses from the 1990 levels—to a maximum of $15 million in the second year and $30 million in the third and fourth years, not to exceed $75 million in the aggregate—may be removed from the funds otherwise paid into Pool A and may be used for deferral payments. No claimant will receive a deferral payment in excess of $2,000. The Trust, with the concurrence of the Selected Counsel for the Beneficiaries after consultation with the Trust's Special Advisor, if it determines that it is in

the financial interest of all claimants, may offer additional deferral payments in later years including years after the sale of Manville stock.

Such deferral payment offers can be accepted by claimants whether or not they are eligible at that time for pro rata payments through Pool A. These payments will not be part of any pro rata pool and can be made at any time.

Claimants who accept a deferral shall have resolved any and all Level Two claims but will be permitted to re-enter Level One if their disease progresses, as set forth in Part A above.

H. *All Trust Beneficiaries Treated Alike.*

In order to conserve the assets of the Trust, Trust beneficiaries—both plaintiffs and defendants—will be ordered to dismiss, without prejudice, all present cases, will be enjoined from filing future litigation against Manville or the Trust, and will be required to pursue their claims against the Trust only as provided in the Distribution Process. The injunction will extend to all issues involving the Trust including its status or lack of status as a joint tortfeasor, its relative share of fault, if any, or its liability or lack of liability for contribution or indemnification. Except for appeals now pending, the Trust will make no appearance in any court, and no beneficiary will be permitted to proceed in any manner against the Trust or Manville in any State or federal court, except as provided in C above. In any litigation between beneficiaries of the Trust, all beneficiaries will be enjoined from asserting, or introducing, evidence to establish (a) that the Trust (in Manville's stead) is a joint and/or several tortfeasor, (b) that the Trust is in any way responsible for any injury, or (c) that the Trust would have been responsible for any injury had it been made or remained a party in the case. All beneficiaries must pursue their claims—whether for asbestos disease, or for contribution or indemnification—within the Trust Distribution Process.

The same process described above for the liquidation of asbestos plaintiffs' claims

before the Trust will also govern the liquidation of a defendant's claims for contribution and/or indemnification where a defendant has paid a judgment for which it claims the Trust has responsibility in whole or in part. Where the plaintiff has not liquidated the claim against the Trust, the defendant who has paid a judgment and has absolved the Trust from further liability to the plaintiff, may file a proof of claim with the Trust seeking a liquidation of the value of the underlying claim against the Trust and a determination whether or not, and to what extent, the Trust has the status of a joint tortfeasor or indemnitor. The Trust will process the claim, classifying it according to the category in which the plaintiff's disease would have been placed. When the claim comes up for liquidation according to the process set forth above, the Trust will resolve the basis for Trust responsibility, if any, and if such a basis is found, offer a liquidation value for the claim within the range of the category of plaintiff's disease. If the defendant disagrees with the Trust's determination, in whole or in part, it may go to arbitration or trial, as would any other claimant. Any ensuing liquidation or judgment within the underlying claim's value range will be paid out of Pool A or the principal account, as the case may be, and any judgment amount in excess of that range will be paid out of Pool B.

In the event that a plaintiff has already liquidated the claim against the Trust, a defendant who has satisfied a judgment rendered for which it claims the Trust has responsibility, in whole or in part, may submit that issue within thirty days after the judgment shall become non-appealable to a Trust arbitral panel. Timely submission of the issue to a Trust arbitral panel shall stay payment of the judgment to the extent of any cash proceeds theretofore received by the plaintiff from the Trust for that cause of action. Upon proof of an entitlement to contribution or indemnification, the defendant will then be entitled to take credit against the judgment for any cash that the plaintiff has received from the Trust and succeed to the plaintiff's entitlements from the Trust for that cause of action.

### I. *Attorneys' Fees.*

Attorneys' fees payable in connection with claims liquidated and paid through this process after the process is finally approved by the court, where calculated as a percentage of recovery, will be the *lower* of the fee provided in the contract between claimant and counsel or 25%. Legal fees will be paid as payments to claimants are made by the Trust.

### J. *Dispute Resolution.*

In any circumstance hereunder where the Trust makes a decision with respect to matters which require the concurrence of the Selected Counsel for the Beneficiaries, the Trust will:

(i) provide Selected Counsel for the Beneficiaries and the Special Advisor to the Trust with reasonable access to experts retained by the Trust and Trust staff during such time as the decision is being made;

(ii) bring the proposed decision to the attention of the Selected Counsel for the Beneficiaries and the Special Advisor to the Trust; and

(iii) provide the Selected Counsel for the Beneficiaries no less than 45 days to comment with respect to such proposed decision.

In the event the Selected Counsel for the Beneficiaries disagree with the Trust's decision, they shall express their view as fully as possible to the Trust and make such counter-proposal as may be appropriate. The Trust and Selected Counsel for the Beneficiaries shall thereupon consult together with the Special Advisor to the Trust in an effort to reach concurrence.

While it is anticipated that the mutual interests of the Trust and Selected Counsel for the Beneficiaries, together with the sharing of information which is envisioned under this Trust Distribution Process, are likely to yield concurrence whenever called for under this Trust Distribution Process, there may be situations where a genuine disagreement arises which would have the

effect of preventing or permitting steps to be taken to which either the Trust or Selected Counsel for the Beneficiaries do not agree. In such event, either the Trust or the Selected Counsel for the Beneficiaries may request that the dispute be resolved and, pending resolution of the dispute, the actions in questions shall remain in abeyance.

If and when the Trust or the Selected Counsel for the Beneficiaries shall ask that a dispute be resolved, the following procedure shall be applied:

(i) the Trust and Selected Counsel for the Beneficiaries may agree upon an individual to serve as a dispute resolver;

(ii) if there is no agreement, the Special Advisor to the Trust shall nominate three separate individuals to serve as the dispute resolver, selecting them based upon the Special Advisor's knowledge of the issues in dispute and of the competencies of the individuals to be selected;

(iii) the Trust shall strike one of the three nominees;

(iv) the Selected Counsel for the Beneficiaries shall next strike one of the remaining two nominees; and

(v) the remaining nominee shall serve as the dispute resolver and his/her decision shall be final and binding on the Trust and the Selected Counsel for the Beneficiaries.

In such a dispute resolution process, the Trust and Selected Counsel for the Beneficiaries shall have an opportunity to fully explain their positions to the dispute resolver and the Special Advisor to the Trust shall be available to assist. The dispute resolver shall be empowered to engage such expert advice as he/she shall deem appropriate.

In the event that a dispute involves distribution of Trust funds, any distribution of amounts covered by the dispute shall await conclusion of the dispute resolution process.

### K. *Miscellaneous.*

All terms which are defined terms in the Manville Corporation Second Amended and Restated Plan of Reorganization shall have the same meanings in this document and, to the extent not inconsistent with the provisions of this document, all provisions in the Plan shall continue in force.

All aspects of this distribution plan, including payment levels established in accordance with the terms of this plan, may be amended, altered or adjusted to reflect changed circumstances, greater information and/or to improve procedures with the mutual concurrence of the Trust and the Selected Counsel for the Beneficiaries, after consultation with the Special Advisor to the Trust. Similarly, the Trust may agree with Manville Corporation to amend documents executed between the two with the concurrence of the Selected Counsel for the Beneficiaries, after consultation with the Special Advisor to the Trust, and the Trust will promptly provide copies to the Selected Counsel for the Beneficiaries of all notices sent or received pursuant to such documents. Also, upon the written request by the Selected Counsel for the Beneficiaries and following the execution of appropriate confidentiality agreements, the Trust will report to the Selected Counsel for the Beneficiaries with respect to the progress of Manville Corporation in obtaining the financing necessary to pay the special dividends, the payment of which is conditional upon Manville Corporation obtaining financing.

In the event that the positions of the Selected Counsel for the Beneficiaries are no longer filled as described in the Manville Corporation Second Amended and Restated Plan of Reorganization, the appointment of three attorneys to fill that role shall be made from time to time by the President of the Association of Trial Lawyers of America or his/her designee. The Special Advisor to the Trust shall be appointed from time to time by the Trust with the concurrence of the Selected Counsel for the Beneficiaries. Initially, that role will be filled by Mark Peterson, Esq.

The Trust shall monetize its assets at the earliest opportunity consistent with its obligation to preserve and enhance the value of the Trust estate and further the prompt, fair and equitable distribution of Trust as-

sets to all present and future beneficiaries of the Trust. In reaching decisions on these subjects, the Trust shall be guided by an investment banker or bankers selected by the Trust, with the concurrence of the Selected Counsel for the Beneficiaries, after consultation with the Special Advisor to the Trust, and such investment banker or bankers shall be available to discuss and explain their recommendations to the Selected Counsel for the Beneficiaries and the Special Advisor to the Trust from time to time as they may be requested to do so. Such concurrence shall be sought at the earlier of the time all appeals have been concluded or if a major transaction is proposed to or by the Trust.

Subject to entry into an appropriate confidentiality agreement where applicable, the Trust shall make available to Selected Counsel for the Beneficiaries and to the Special Advisor to the Trust any other investment banking or other financial and accounting information available to the Trust relating to issues to be discussed and/or as to which concurrence of Selected Counsel for the Beneficiaries is required.

The reasonable expenses of Selected Counsel for the Beneficiaries, together with the reasonable fees and expenses of their counsel and the reasonable charges and expenses of the Special Advisor to the Trust and of any dispute resolver, shall be borne by the Trust.

No one acting in his/her capacity as one of the Trustees, Selected Counsel for the Beneficiaries, the Special Advisor to the Trust, and/or dispute resolver shall be liable to any entity or person except for his/her own gross negligence or willful misconduct.

L. *Adjustment of the Distribution Process if Changes in Information Invalidate Basic Assumptions.*

This Trust Distribution Process is based upon reasonable information both with respect to valuations of the Trust's assets and expectations about its future liabilities. Based on that information, it is assumed that the Trust's holdings of Manville Corporation stock, when liquidated, will pro-

duce an amount approximately equal to the sum of the then present value of proceeds that the Trust will receive from all of its other holdings (e.g., dividends, special dividends, bond payments and bond monetizations, and profit sharing prior to sale of the equity). It is also assumed that the number of claims that will be filed after this plan becomes effective will be less than the number of claims pending on the date the claim becomes effective. Based on this information and these assumptions, it is further assumed that funds from the sale of the equity will be sufficient to pay then unliquidated and future claim amounts equivalent to those already paid pursuant to this Distribution Process plus some excess to be distributed across all claimants.

In order to ensure, as best as possible, that the basic assumptions which underlie the Distribution Process remain valid so that all claimants will be treated in the same way, the Trust shall, from time to time, estimate the values of its total assets and its total liabilities. In determining total assets, the Trust will include monies already paid to claimants, monies on hand, monies anticipated to be received over time both from bond and profit-sharing obligations, monies to be received upon sale of its equity interest in Manville Corporation and interest on these assets. Similarly, in determining total liabilities the Trust will consider the liquidated values of claims already liquidated (without reduction for monies already paid to claimants), and make estimates of the liquidated values of claims filed but not yet liquidated and of claims that might yet be filed. Based on this analysis, the Trust shall determine (1) if the anticipated values of assets have been so reduced and/or the expectation of future claims so increased that monies otherwise distributable through Pool A must be withheld from Pool A and held for distribution to existing but unliquidated claims and/or future claims, or (2) the anticipated values of assets have been so increased and/or the expectation of future claims so reduced that amounts within the principal account may be distributed through Pool A. The Trust shall provide Selected Counsel for the Beneficiaries and the Special Advisor to

the Trust any proposal for withholding or distribution supported by the results of their analysis and any valuations prepared by the Trust's investment bankers and other consultants. The proposal(s) shall take effect upon the concurrence of the Selected Counsel for the Beneficiaries, after consultation with the Special Advisor to the Trust.

For purposes of description, this process could result in a termination of payments into Pool A (even of bond or profit-sharing amounts) where remaining assets have been so reduced in value that future payments are not likely to equal payments already made into the Pool. Conversely, the process could result in moving funds from the principal account to Pool A when the remaining assets (including funds in the principal account) will result in payments to unliquidated and future claimants that exceed payments already made. Estimation shall be done in a manner that

protects future claimants from unreasonable risks, because it may prove possible to make additional payments into Pool A as more information is obtained or as illiquid assets are liquidated.

### ATTACHMENT A TO TRUST DISTRIBUTION PROCESS

### DESCRIPTION OF LEVEL I AND LEVEL II CATEGORIES

#### *Preliminary Statement*

The following descriptions and tabular information is provided as a starting point for Trust evaluation and liquidation procedures. It is an attempt to provide operating rules subject to amendment, from time to time, upon the concurrence of the Trust and Selected Counsel for the Beneficiaries after consultation with the Trust's Special Advisor, as additional data and additional experience is collected:

LEVEL I

|  | Maximum Payment | Anticipated Midpoint |
|---|---|---|
| Mesothelioma | 350,000 | 146,000 |
| Lung Cancer | | |
|   Non–Smoker (for 15 years before diagnosis) | 300,000 | 120,000 |
|   Smoker | 150,000 | 70,000 |
| Other Cancer | 75,000 | 20,000 |
| Non–Malignant Disease | 300,000 | 80,000 |

LEVEL II

|  | | |
|---|---|---|
| Asbestosis | 75,000 | 35,000 |
| Pleural Disease | 30,000 | 12,000 |

Factors to be considered in connection with valuation of all levels and categories, from zero up to maximum payments are those listed in Section B.6 of the Claims Resolution Procedures which are Annex B to the Trust Agreement. Maximum payments will only be offered to those claimants who present the most severe combinations of factors to be anticipated within the category and are stated to provide the upper limit of a claim which will enter Pool A. Midpoints are stated as expected averages for negotiation purposes.

In truly extraordinary situations the Trust may offer, or arbitration award, compensation beyond the maximum amounts.

### ATTACHMENT B TO TRUST DISTRIBUTION PROCESS

### DESCRIPTION OF ANALYSIS FOR ALLOCATION OF FUNDS AMONG GROUPS OF CLAIMANTS

Three groups of claimants will have interests in the proceeds of the sale of significant Trust assets and/or any extraordinary payments from Manville Corporation:

1. claimants already in the pool, who will have received only a portion of their liquidated claims;
2. claimants who have filed, but whose claims have not yet been liquidated; and
3. future claimants who have not yet filed.

In principle, from time to time the Trust should retain sufficient proceeds so that the second and third groups of claimants will receive payments comparable to those of the first group. The plan gives the Trust power to reduce or to close off payments to the first group to allow over time for pro rata payments across the three groups.

At the time that revenue is generated, the Trust will know:

Group 1: the number, liquidated value, amount received and balance owed;

Group 2: the number in each level; liquidated values can be estimated from experience with Group 1;

Group 3: nothing.

## ESTIMATING THE NUMBER OF FUTURE CLAIMS

The Trust will draw projections on information about exposures and claims within occupational groups.

First, using available government data, the Trust can determine the number of persons working in each of the asbestos-related trades in specific past years. Second, the Trust will determine trades and years of exposure for each claimant who has filed a claim up to the time of the sale of significant assets. The Trust can use these findings to project the number of future claims that we might expect within 5, 10 or any number of years after the sale of the asset.

The Trust can further refine the analyses to take into account the apparent decline in the incidence of injuries due to reduced workplace contamination. The analyses can incorporate information about the past and projected future number of asbestos-related injuries, such as the work done by Dr. William Nicholson at Mt. Sinai Hospital in New York.

The Trust can improve the projections by making adjustments for important events that suppressed or encouraged the number of claims in particular years (*i.e.*, the period of the bankruptcy, deadlines for filing claims).

As a part of forms sent to claimants, the Trust may ask how they were exposed to asbestos, *i.e.*, their trade, and the years of exposure.

With estimates of the number of future claims (Group 3), the Trust can then determine how much liability can be expected for each Group and the rate of new liability (as existing Group 2 claims are liquidated, and Group 3 claims are brought and liquidated). The Trust can match these by the principal gained by the sale and the expected interest on the undistributed principal to estimate how much must be retained to pay new clients and how much can be devoted to reduce the remaining liability to Group 1 claims.

The methodology described above does not preclude the Trust from using additional methodologies.

## APPENDIX D

## ORDER CONDITIONALLY CERTIFYING CLASS AND APPOINTING REPRESENTATIVE COUNSEL AND OTHERS

The Manville Personal Injury Settlement Trust (the "Trust") has moved pursuant to Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure for a determination that the Trust constitutes a "limited fund under Rule 23(b)(1)(B). To determine whether separate adjudications would substantially impede the ability of the proposed class members to protect their interests, the district court appointed the Honorable Marvin E. Frankel as Special Master to hold hearings and report on the following issues:

(1) Are the financial assets of the Trust so limited that payment of asbestos-related personal injury and wrongful death claims, cross-claims, and third-party claims brought against the Trust are in jeopardy?

(2) Will the claims of earlier litigants paid on an individual basis exhaust the

Trust's available and projected assets, precluding payments to some claimants?

On November 3, 1990 Special Master Frankel submitted his report. After several days of hearings and extensive submissions, he concluded that

> "[h]owever insolvency is defined, the Trust is deeply insolvent ... The Trust's assets and expectations of future receipts are and will be so limited that there is a substantial risk that payments for present and prospective asbestos-related claims for personal injury and wrongful death will be in jeopardy ... There is a substantial probability that the award of damages to earlier litigants will exhaust the Trust's available and projected assets ... The foregoing findings and conclusions, inasmuch as they supply affirmative answers to the Court's questions, are reached upon the basis of evidence that is clear and convincing to the point of being undisputed and beyond dispute in all essential respects."

Special Master's Report, *In re Johns–Manville Corp.*, Nos. 82 B 11656 (BLR) through 82 B 11676 (BLR), at 20–21 (E.D.N.Y. Nov. 3, 1990). [*Supra*, p. 668.]

On November 19, 1990 Plaintiffs Bernadine K. Findley, as Executrix of the Estate of Hilliard Findley, Uma Lail Caldwell, as Executrix of the Estate of Odell Caldwell, Edward Lindley, Joseph C. Jones, and James William Barnette, Jr., ("class plaintiffs") filed a class action on behalf of themselves and all other beneficiaries of the Manville Trust seeking a restructuring of the Trust. Also on November 19, 1990 the class plaintiffs and the Trust filed a proposed stipulation of settlement.

The class plaintiffs seek an order a) conditionally certifying this case as a class action pursuant to Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure on behalf of all beneficiaries of the Trust; b) conditionally appointing the class plaintiffs as class representatives; c) conditionally appointing Ness, Motley Loadholt, Richardson & Poole, P.C.; Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Inc.; Wilentz, Goldman & Spitzer; Baron and Budd; and Rose, Klein & Marias as counsel for the class representatives.

In view of the Special Master's findings and the proposed stipulation of settlement, the courts find that it is appropriate to conditionally certify the class as requested. The courts conditionally certify this case as a class action on behalf of all beneficiaries of the Trust and appoint class plaintiffs as class representatives subject to a final memorandum and order following the conclusion of fairness hearings on the adequacy of the proposed settlement and the propriety of class certification.

The courts also find that it is in the best interests of the class to appoint counsel for class representatives at this time. *See In re Agent Orange Product Liability Litigation*, 818 F.2d 179, 187 (2d Cir.1987) (selection of lead counsel for plaintiff class matter of discretion for district court); *Cullen v. New York State Civil Service Comm'n*, 566 F.2d 846, 848–49 (2d Cir. 1977).

The courts appoint the following counsel to represent the class of beneficiaries of the Trust: Robert B. Steinberg of Rose, Klein & Marias of Los Angeles, California; Ronald L. Motley of Ness, Motley, Loadholt, Richardson & Poole of Charleston, South Carolina; Harry Fred Wartnick of Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris of San Francisco, California; Frederick M. Baron of Baron & Budd of Dallas, Texas; and Christopher M. Placitella of Wilentz, Goldman & Spitzer of Woodbridge, New Jersey. These distinguished members of the plaintiffs' bar, each of whom has extensive experience in complex mass tort litigation, have negotiated vigorously and diligently on behalf of the class of beneficiaries.

In several bankruptcy proceedings involving manufacturers or producers of asbestos, courts have appointed independent legal representatives to protect the interests of future claimants. *See, e.g., Kane v. Johns–Manville Corp.*, 843 F.2d 636, 639 (2d Cir.1988) (appointment of legal guardian for future claimants is proper); *In re Amatex Corp.*, 755 F.2d 1034, 1041–44 (3d Cir.1985) (same); *In re UNR Indus. Inc.*,

46 B.R. 671 (Bankr.N.D.Ill.1985) (same). Consistent with this authority the courts appoint Leslie Gordon Fagen of Paul, Weiss, Rifkind, Wharton & Garrison of New York City to serve as counsel to review the proposed settlement on behalf of "future claimants"—those persons who may file asbestos-related health claims against the Trust in the future. Neither Mr. Fagen nor any member of his firm represents any claimants seeking compensation for illness or wrongful death caused by exposure to asbestos from the Manville Trust. He is an accomplished member of the bar with substantial experience in civil litigation.

A copy of the resumes of all counsel are attached. [Omitted.]

So ordered.

Dated: Brooklyn, New York
November 23, 1990

———————————

Jack B. Weinstein
United States District Judge

———————————

Burton R. Lifland
Chief Judge
Bankruptcy Court of Southern District of New York

## APPENDIX E

### ORDER SETTING HEARINGS AND APPROVING FORM OF NOTICE

This matter came before the District Courts for the Eastern and Southern Districts of New York and the Bankruptcy Court for the Southern District of New York (the "courts") on the motion (the "Motion") of Bernadine K. Findley, Uma Lail Caldwell, Edward Lindley, Joseph C. Jones and James William Barnette, Jr., plaintiffs ("Plaintiffs") in this class action (the "Class Action") for an order, *inter alia,* approving pursuant to Rule 23 of the Federal Rules of Civil Procedure a form of notice for hearings to consider the unconditional certification of the Class Action and approval of the settlement of the Class Action and directing that such notice be provided to all ascertainable members of the class in the Class Action (the "Class").

It appearing that a Stipulation of Settlement (the "Stipulation") has been filed in settlement of the Class Action with the courts, and the courts this day having conditionally certified the Class Action as a class action pursuant to Rule 23(b)(1)(B) and conditionally appointed Plaintiffs as the representatives of the Class, and upon review of the proposed form of notice annexed to the Motion, it is hereby

ORDERED that hearings to determine, *inter alia,* whether the Class Action should be unconditionally certified as a class action, whether the Plaintiffs should be unconditionally appointed representatives of the Class, and whether the proposed settlement embodied in the Stipulation is fair, reasonable and adequate and should be approved by the courts pursuant to Rule 23(e), and judgment entered thereon, and the Class Action dismissed with prejudice on the merits, will be held at the times and places stated on the notice annexed hereto as Attachment A, and it is hereby further

ORDERED that the form of written notice annexed hereto as Attachment A be, and it hereby is, approved as adequate notice to members of the Class of the matters to be considered at such hearings, and it is hereby further

ORDERED that the Manville Personal Injury Settlement Trust shall serve a copy of this Order and the notice approved herein by first class mail no later than November 30, 1990 upon counsel for plaintiffs in the Class Action Complaint, Selected Counsel for the Beneficiaries and their Counsel, the Special Advisor to the Bankruptcy Court, Counsel for individual Trust Beneficiaries known to the Trust, Co–Defendants known to the Trust, the Property Damage Trust and Trust Beneficiaries who are not represented by counsel, to all courts in which cases against the Trust are pending, and by publication no later than November 30, 1990 in periodicals of general circulation (as noted in Attachment B) and in the New York Law Journal, of a notice of the pendency of the hearings set forth in Attachment A and instructions on how persons may promptly obtain a copy of the notice approved herein.

SO ORDERED.

Dated: Brooklyn and New York,
New York
November 23, 1990

_____
Jack B. Weinstein
United States District Judge

_____
Burton R. Lifland
Chief Judge
Bankruptcy Court of Southern
District of New York

### ATTACHMENT A TO ORDER SETTING HEARINGS AND APPROVING FORM OF NOTICE

TO: ALL INDIVIDUALS AND ENTITIES WHO ARE BENEFICIARIES OF THE MANVILLE PERSONAL INJURY SETTLEMENT TRUST AND HAVE NOW OR WILL HAVE A CLAIM AGAINST THE TRUST EITHER FOR DEATH OR PERSONAL INJURY CAUSED BY EXPOSURE TO ASBESTOS, OR A CLAIM FOR WARRANTY, GUARANTY, INDEMNIFICATION OR CONTRIBUTION ARISING FROM AN OBLIGATION OF THE TRUST FOR THE PAYMENT OF A DEATH OR PERSONAL INJURY CLAIM

NOTICE IS HEREBY GIVEN that hearings will be held before the Honorable Jack B. Weinstein, U.S. District Judge acting for the Eastern and Southern Districts of New York, and the Honorable Burton R. Lifland, Chief Bankruptcy Judge for the Southern District of New York (the "Courts") at the places and times specified below, for the purpose of determining whether to certify the proposed class and whether the proposed settlement restructuring the Manville Personal Injury Settlement Trust (the "Trust") described below is fair, reasonable and adequate and should be approved by the Courts, and judgment entered thereon, and the class action dismissed with prejudice and on the merits. The hearings will be held as follows:

| PLACE | DATE | TIME |
|---|---|---|
| Courthouse U.S. District Court for the Eastern District of New York 225 Cadman Plaza East Brooklyn, New York 11201 | January 2, 1991 | 10 a.m. |
| Courthouse U.S. District Court for the District of Columbia 3rd and Constitution Avenue, N.W. Washington, D.C. 20001 | January 4, 1991 | 10 a.m. |
| Courthouse U.S. District Court for the Eastern District of Louisiana 500 Camp Street New Orleans, Louisiana 70130 | January 9, 1991 | 10 a.m. |
| Courthouse U.S. District Court for the Northern District of California 450 Golden Gate Avenue San Francisco, California 94012 | January 11, 1991 | 10 a.m. |

THE SENDING OF THIS NOTICE IS NOT TO BE CONSTRUED AS AN EXPRESSION OF ANY OPINION BY THE COURTS AS TO THE MERITS OF THE CASE.

### 1. *Nature of the Complaint.*

On November 19, 1990 a class action complaint was filed by Bernadine K. Findley, as Executrix of the Estate of Hilliard Findley, Uma Lail Caldwell, as Executrix of the Estate of Odell Caldwell, Edward Lindley, Joseph C. Jones and James William Barnette, Jr., claiming to be beneficiaries of the Trust against the Trustees and the Trust. The plaintiffs claim that they are beneficiaries of the Trust and that they can adequately and fairly represent the interests of all Trust beneficiaries. The class complaint alleges that, although the Trust is required to pay the claims of its beneficiaries in full shortly after claims are liquidated in amount, the assets of the Trust are insufficient to permit the Trust to continue to pay all claims in full shortly after they are liquidated in amount, or at any time, without jeopardizing the payment of claims of other beneficiaries of the Trust. The complaint alleges the need for the determination of an equitable allocation of the Trust's assets among all its beneficiaries and a restructuring of the Trust's procedures to substantially reduce Trust expenses.

The plaintiffs have retained as counsel to represent them the firms of Rose, Klein & Marias, of Los Angeles, California, Ness, Motley, Loadholt, Richardson & Poole, P.A., of Charleston, South Carolina, Baron & Budd, of Dallas, Texas, Wilentz, Goldman & Spitzer, of Woodbridge, New Jersey, Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Inc., of San Francisco, California, and, of counsel, Caplin & Drysdale, Chartered, of New York, New York and Washington, D.C.

### 2. *Prior Proceedings.*

On September 18, 1990, the Trust moved for an order determining whether the financial assets of the Trust are so limited that there exists a substantial risk that payment for the present and prospective asbestos-related claims for personal injury and wrongful death will be placed in jeopardy. The Courts referred these questions to Special Master Marvin E. Frankel who, after hearings, rendered a report dated November 3, 1990 which contained his proposed findings and recommendations to the Courts that the Trust is deeply insolvent and that its assets and expectations of future receipts are and will be so limited that there is a substantial risk that payment for present and prospective asbestos-related claims for personal injury and wrongful death will be in jeopardy.

At a hearing held on November 23, 1990, the Courts determined provisionally that the plaintiffs are adequate representatives of the class of all beneficiaries and appointed their counsel to represent the class. The Courts also appointed Leslie Fagen, Esq. of Paul, Weiss, Rifkind, Wharton & Garrison, to represent and protect the interests of future claimants, Roger E. Podesta, Esq., of Debevoise & Plimpton, John D. Aldock, Esq., of Shea & Gardner and Andrew Berry, Esq., of McCarter & English, to represent defendants, other than the Trust, in pending asbestos litigation, and Laurence Gold, Esq., General Counsel of the AFL–CIO, as friend of the Courts.

### 3. *Summary of Terms of the Settlement.*

Under the terms of the settlement, if it is approved by the Courts, all available funds of the Trust will be distributed annually as claims against the Trust are liquidated. Funds will be distributed pro rata with each claimant receiving an annual payment from available monies equal to the claimant's liquidated amount as a fraction of all liquidated amounts. The ultimate goal of the proposed plan is to treat all claimants alike by paying all claimants an equal percentage of their claim values over time. The final amount that each claimant will receive cannot be predicted at this time because it will depend upon not only the liquidated value of the claim but, also, the ultimate value of the Trust's total assets and the eventual number of claims. However, those claims that have been previously settled or resolved by judgments will be paid in accordance with their terms if the plan becomes effective.

While it is the goal of the proposed restructuring to treat all beneficiaries alike— both persons who have been injured by

asbestos and entities who have claims for contribution or indemnification resulting from payments they have made to beneficiaries of the Trust—the proposed plan recognizes the great need of the most seriously-injured claimants and their families. Accordingly, under the terms of the restructuring, those claimants with death claims, claims for cancer and those asbestosis claims which are so serious as to mandate treatment on a par with cancer claims will be preferred in timing during the first two years after the plan begins by receiving all money available through the pro rata distributions during those years. Beginning in the third year payments to other less seriously-injured claimants will commence.

All present litigation between the Trust and its beneficiaries will be terminated and all further liquidation of claims will be accomplished in accordance with the proposed new Distribution Process.

As part of the new Distribution Process, plaintiffs' attorneys have agreed to limit their fees to a maximum of 25% of payments made to their clients and to assume special burdens of the processing of Trust claims.

### 4. *Additional Funding of the Trust.*

In conjunction with the restructuring of the Trust Distribution Process, a separate agreement has been reached between the Trust and Manville Corporation under which Manville Corporation should provide, subject to the ability to obtain financing, additional dividend payments to the Trust of at least $280 million and, depending upon certain other contingencies, a total additional sum of up to $520 million. These funds will be in addition to the assets now owned by the Trust. The settlement procedures include a release of Manville Corporation and affiliates by the class and a reaffirmation of the injunction barring litigation by all beneficiaries against Manville Corporation.

### 5. *Issues to be Considered at the Hearings.*

The issues to be considered by the Courts include the following:

(a) whether or not the plaintiffs adequately represent the class of all beneficiaries of the Trust and whether this action is a proper class action under the relevant rules of federal procedure:

(b) whether or not the Trust's assets are so limited that fairness requires establishment of an equitable distribution process for all beneficiaries and, in that connection, whether the proposed findings and recommendations of Special Master Marvin E. Frankel should be adopted;

(c) whether or not the proposed restructuring of the Trust and the new Distribution Process is fair and reasonable in the circumstances;

(d) whether the execution of releases of Manville Corporation and affiliates and the reaffirmation of the injunction protecting them from suit should be approved;

(e) the adequacy and competence of counsel for the plaintiffs' class, and an award of counsel fees to Caplin & Drysdale, Chartered, of counsel to plaintiffs' class, in such amount as the Courts might determine reasonable in the circumstances, together with reimbursement of, the out-of-pocket expenses of plaintiffs' counsel and Plaintiff's Negotiating Committee; and

(f) such matters as any person wishes to bring to the Courts' attention.

### 6. *The Rights of Beneficiaries.*

The pleadings and other papers, including the settlement agreement, filed in this action are available for inspection in the offices of each of the clerks of the four courts where the hearings will be held.

In the event that the Courts approve this settlement restructuring the Manville Trust, all beneficiaries of the Trust will be bound by its terms and be required to process their claims against the Trust in accordance with the Distribution Process provided.

Any beneficiary may appear in person or by counsel at any one of the settlement hearings and show cause why the settlement, the releases and reaffirmation of the injunction, or the payment of fees and costs

should not be approved. The Courts request that all persons who wish to be heard orally at the hearings advise the Clerk of the Court for the United States District Court for the Eastern District of New York no later than December 31, 1990, in order to facilitate scheduling. Whether or not scheduled, all beneficiaries present at any of the hearings will be permitted to address the Courts orally or to submit written materials in connection with these issues. Any and all written materials must be filed with the Clerk of the Court of the United States District Court for the Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York 11201, no later than the close of business on January 11, 1991. Dated:

---

Clerk, U.S. District Court
Eastern District of New York

---

Clerk, U.S. District Court
Southern District of New York

---

Clerk, U.S. Bankruptcy
Court, Southern District
of New York

### ATTACHMENT B

*Publication List*
1. *New York Law Journal*
2. *The New York Times*
3. *The Washington Post*
4. *The States Item/Time Picayune*
5. *The San Francisco Chronicle*
6. *The Dallas Morning News*
7. *The Atlanta Journal and The Atlanta Constitution*
8. *USA TODAY*
9. *Chicago Tribune*
10. *Los Angeles Times*
11. *The Baltimore Sun*

### APPENDIX F

### ORDER STAYING PAYMENTS

This matter came before the District Courts for the Eastern and Southern Districts of New York and the Bankruptcy Court for the Southern District of New York (the "courts") on the Motion (the "Motion") of the Manville Personal Injury Settlement Trust (the "Trust"), dated November 19, 1990, for an order restraining all Beneficiaries of the Trust, the officers, agents, servants, employees, and attorneys of any Trust Beneficiaries, and all other persons who obtain actual notice of the proposed Order from (a) commencing or continuing any action or proceeding of any kind against the Trust, pending the litigation and determination of the class action (the "Class Action") filed November 19, 1990 in the courts by Bernadine K. Findley and certain other beneficiaries of the Trust against the trustees of the Trust seeking a restructuring of the obligations and payment procedures of the Trust and (b) executing or otherwise enforcing judgments against the Trust or its assets and any other efforts to collect upon such judgments pending the litigation and determination of the Class Action.

It appearing that notice of the hearing upon the Motion was duly given by service of the Order to Show Cause of the courts, dated November 19, 1990, upon the persons and in the manner and times prescribed therein, and the Motion having duly come on to be heard on November 23, 1990, and after considering the Motion, the Trust's accompanying Memorandum of Law, and the Affidavit of Joseph S. Kieffer, Deputy General Counsel of the Trust, in support of the Motion, as well as the courts' review of the Class Action Complaint filed by Bernadine K. Findley, as Executrix of the Estate of Hilliard Findley, Uma Lail Caldwell, as Executrix of the Estate of Odell Caldwell, Edward Lindley, Joseph C. Jones, and James William Barnette, Jr., on behalf of themselves, and all others similarly situated as beneficiaries of the Manville Personal Injury Settlement Trust, and all exhibits thereto, and all papers filed in opposition to the Motion, and after hearing argument of counsel both in support of and in opposition to the Motion, and after due consideration it appearing that the injunctive relief provided below (a) is within the jurisdiction and authority of the courts; (b) is necessary to prevent the dissipation of

the assets and resources of the Trust while the Class Action and restructuring of the Trust that is the subject of the Class Action is pending; and (c) is necessary to prevent wasteful and duplicative litigation and avoid the danger of inconsistent results, it is hereby

ORDERED that pending the litigation and determination of the Class Action, all Trust Beneficiaries, the officers, agents, servants, employees and attorneys of any of the foregoing and all other persons who obtain actual notice of this Order are enjoined and restrained from the execution or other enforcement of judgments against the Trust or its assets, including assets in the possession of Manville Corporation or any other persons or entities other than the Trust, and any other effort to collect upon such judgments by whatever means or remedies, including judicial process or nonjudicial means; and the obtaining or enforcement of provisional remedies against the Trust or its assets; and it is further

ORDERED, that the Trust is hereby ordered pending the litigation and determination of the Class Action, and subject to further order of the courts for good cause shown:

(1) Except as noted in paragraph (3) below, to make no payments for claims heretofore settled and to make no further settlements except in accordance with the terms of the Stipulation of Settlement of the Class Action.

(2) To make no payments for judgments heretofore entered or hereafter obtained, except as provided in the Stipulation of Settlement.

(3) The Trust is permitted to make payments for Hardship Claims and Exigent Health Claims previously settled and to pay, pursuant to the Stipulation of Settlement, Hardship Claims and Exigent Health claims hereafter settled.

(4) The Trust is permitted to pay Trust expenses, disbursements, legal fees of attorneys retained by the Trust, the fees of the Special Advisor to the Bankruptcy Court and his counsel to the extent approved by the Bankruptcy Judge, operating expenses including staff salaries, trustees' fees, legal fees of Counsel to the Selected Counsel for the Beneficiaries, other fees that may be authorized and approved by the courts and all ordinary and necessary Trust expenses.

(5) Offers by the Trust to settle Claims that were outstanding on Monday, November 19, 1990, must be accepted by the close of business on Monday, December 3, 1990, or they will be deemed withdrawn; and it is further

ORDERED, that service of this Order shall be made by the Trust by fax and overnight mail by no later than November 30, 1990 upon counsel for plaintiffs in the Class Action Complaint, Selected Counsel for the Beneficiaries and their Counsel, the Special Advisor to the Bankruptcy Court, Counsel for individual Trust Beneficiaries known to the Trust, Co–Defendants known to the Trust, the Property Damage Trust and Trust Beneficiaries who are not represented by counsel.

SO ORDERED.

Dated: Brooklyn and New York,
New York
November 23, 1990

---

Jack B. Weinstein
United States District Judge

---

Burton R. Lifland
Chief Judge
Bankruptcy Court of Southern
District of New York

APPENDIX G

ORDER STAYING PROCEEDINGS

This matter came before the District Courts for the Eastern and Southern Districts of New York and the Bankruptcy Court for the Southern District of New York (the "Courts") on the Motion (the "Motion") of the Manville Personal Injury Settlement Trust (the "Trust), dated November 19, 1990 for an Order restraining all Beneficiaries of the Trust, the officers, agents, servants, employees, and attorneys of any Trust Beneficiaries, and all other person who obtain actual notice of the pro-

posed Order from (a) commencing or continuing any action or proceeding of any kind against the Trust, pending the litigation and determination of the class action (the "Class Action") filed November 19, 1990 in the Courts by Bernadine K. Findley and certain other beneficiaries of the Trust against the Trustees of the Trust seeking a restructuring of the obligations and payment procedures of the Trust and (b) executing or otherwise enforcing judgments against the Trust or its assets and any other efforts to collect upon such judgments or enforcing settlement agreements pending the litigation and determination of the Class Action.

It appearing that notice of the hearing upon the Motion was duly given by service of the Order to Show Cause of the Courts, dated November 19, 1990, upon the persons and in the manner and times prescribed therein, and the Motion having duly come on to be heard on November 23, 1990, and after considering the Motion, the Trust's accompanying Memorandum of Law, and the Affidavit of Joseph S. Kieffer, Deputy General Counsel of the Trust, in support of the Motion, as well as the Courts' review of the Class Action Complaint filed by Bernadine K. Findley, as Executrix of the Estate of Hilliard Findley, Uma Lail Caldwell, as Executrix of the Estate of Odell Caldwell, Edward Lindley, Joseph C. Jones, and James William Barnette, Jr., on behalf of themselves, and all others similarly situated as beneficiaries of the Manville Personal Injury Settlement Trust, and all exhibits thereto, and all papers filed in opposition to the Motion, and after hearing argument of counsel both in support of and in opposition to the Motion, and after due consideration it appearing that the injunctive relief described below (a) is within the jurisdiction and authority of the courts; (b) is necessary to prevent the dissipation of the assets and resources of the Trust while the Class Action and restructuring of the Trust that is the subject of the Class Action is pending; and (c) is necessary to prevent wasteful and duplicative litigation and avoid the danger of inconsistent results, it is hereby

ORDERED, that pending the litigation and final determination of the instant Class Action, all state court and federal court proceedings against the Trust are hereby stayed subject to exceptions for good cause shown. This stay is not meant to and does not stay proceedings against other defendants. Applications for such exceptions shall be made to the United States District Court for the Eastern District of New York, in writing, with service on counsel for the parties. Such applications shall be heard on an expedited basis.

While the effect of this Order is to stay all cases against the Trust in all jurisdictions, the Courts one again ask all parties in pending litigation in which the Trust is a party, and all courts conducting litigation in which the Trust is scheduled for trial as a party, to cooperate with these courts in the interest of preserving the Trust's assets—presently being dissipated at the rate of nearly $1 million per week for legal defense costs—for the benefit of all Trust Beneficiaries.

A Memorandum explaining the basis for this Order will be issued shortly. In view of the exigencies, the entry of this Order cannot await publication of such a Memorandum.

So Ordered.

Dated: Brooklyn, New York
November 23, 1990

_____
Jack B. Weinstein
U.S. District Judge

_____
Burton R. Lifland
Chief U.S. Bankruptcy Judge

APPENDIX H

ORDER MAKING EXCEPTIONS TO
STAY OF PROCEEDINGS

This matter came before the District Courts for the Eastern and Southern Districts of New York and the Bankruptcy Court for the Southern District of New York (the "Courts") on the Motion (the "Motion") of the Manville Personal Injury Settlement Trust (the "Trust"), dated November 19, 1990 for an Order restraining all Beneficiaries of the Trust, the officers, agents, servants, employees, and attorneys

of any Trust Beneficiaries, and all other persons who obtain actual notice of the proposed Order from (a) commencing or continuing any action or proceeding of any kind against the Trust, pending the litigation and determination of the class action (the "Class Action") filed November 19, 1990 in the Courts by Bernadine K. Findley and certain other beneficiaries of the Trust against the Trustees of the Trust seeking a restructuring of the obligations and payment procedures of the Trust and (b) executing or otherwise enforcing judgments against the Trust or its assets and any other efforts to collect upon such judgments pending the litigation and determination of the Class Action.

It appearing that notice of the hearing upon the Motion was duly given by service of the Order to Show Cause of the courts, dated November 19, 1990, upon the persons and in the manner and times prescribed therein, and the Motion having duly come on to be heard on November 23, 1990, and after considering the Motion, the Trust's accompanying Memorandum of Law, and the Affidavit of Joseph S. Kieffer, Deputy General Counsel of the Trust, in support of the Motion, as well as the courts' review of the Class Action Complaint filed by Bernadine K. Findley, as Executrix of the Estate of Hilliard Findley, Uma Lail Caldwell, as Executrix of the Estate of Odell Caldwell, Edward Lindley, Joseph C. Jones, and James William Barnette, Jr., on behalf of themselves, and all others similarly situated as beneficiaries of the Manville Personal Injury Settlement Trust, and all exhibits thereto, and all papers filed in opposition to the Motion, and after hearing argument of counsel both in support of and in opposition to the Motion, and after due consideration it appearing that the injunctive relief provided below (a) is within the jurisdiction and authority of the courts; (b) is necessary to prevent the dissipation of the assets and resources of the Trust while the Class Action and restructuring of the Trust that is the subject of the Class Action is pending; and (c) is necessary to prevent wasteful and duplicative litigation and avoid the danger of inconsistent results, the courts have reached the following decision concerning litigation against the Trust.

The courts today have issued a number of orders, including one that stays all pending state court and federal court proceedings against the Trust, subject to exceptions for good cause shown. The Trust is presently a party defendant in a number of ongoing trials. While it is customary in class action litigation to stay pending litigation against a class action defendant, it is a sharp departure from existing practice to stay litigation where a trial against a class action defendant is already underway.

Particularly during the transition period between Conditional Certification of a Limited Fund Class Action, an Order for which was entered today, and an entry of a final Order (if one is granted) approving such a class action, it may be appropriate to permit ongoing litigation against the party defendant to continue. This is particularly true where an ongoing trial is at a stage where the severance of a co-defendant might substantially and detrimentally effect the rights of the plaintiffs and other defendants, or where local law or the idiosyncrasies of local practice would suggest that the trial should continue.

Therefore, based on the foregoing, it is hereby

ORDERED, that the following ongoing trials actually underway in which the Trust is a party defendant are hereby exempted from the order entered this day by the courts staying all state court and federal court proceedings against the Trust:

* *Horace Chatham, et al. vs. Acands, Inc., et al.,* In the 125th Judicial District Court of Harris County, Texas; Cause No. 85–18513;

* *Daniel Blue, et al. vs. Fibreboard Corporation, et al.,* Case No. C595175, Superior Court of the State of California for the County of Los Angeles;

* *In re New York City Asbestos Litigation* cases now pending before the Honorable Helen Freedman, Supreme Court, New York County;

* Cases now on trial before the Honorable Sandra Moss and the Honorable Nelson Diaz, Court of Common Pleas, Philadelphia, Pennsylvania;

* New York Navy Yard Phase I claims in the Eastern District of New York

and it is hereby further

ORDERED, that the courts will consider application with respect to any additional ongoing trials in which the Trust is a party defendant for the purpose of exempting such trials from the stay referred to above, provided that before such application is filed, the moving party has received permission from the presiding judicial officer at the ongoing trial to file such application; and it is hereby further

ORDERED, that pursuant to the stay entered this day prohibiting the Trust from making any payments to Trust beneficiaries except for Hardship and Exigent Health claims, any final, non-appealable judgments entered against the Trust with respect to any pending trials are not to be paid and are subject to exhibit A to the stipulation of settlement submitted on November 19, 1990 in this action, if approved; and it is hereby further

ORDERED, that the procedures the Trust will use to liquidate any such judgments described in the preceding decretal paragraph shall be determined at a later date.

So ordered.

Dated:   Brooklyn, New York
         November 23, 1990

-----------------------------
Jack B. Weinstein
United States District Judge

-----------------------------
Burton R. Lifland
Chief Judge
United States Bankruptcy Court

### APPENDIX I

### ORDER APPOINTING DEFENDANTS' REPRESENTATIVES

The United States District Courts for the Eastern and Southern Districts of New York and the Bankruptcy Court for the Southern District of New York have heard the application of Owens–Corning Fiberglass on behalf of itself and other defendants in pending asbestos litigation on November 23, 1990. They grant this motion in part by appointing as representatives of defendants, other than the Manville Personal Injury Settlement Trust, in pending asbestos litigation to appear in any capacity at all fairness hearings and to consult with all parties and representatives respecting the settlement of all claims against the Manville Personal Injury Settlement Trust:

Roger E. Podesta—Debevoise & Plimpton

John D. Aldock—Shea & Gardner

Andrew Berry—McCarter & English

All parties are directed to fully cooperate with the above representatives.

Dated:   November 23, 1990
         Brooklyn, New York

-----------------------------
Jack B. Weinstein
United States District Judge

-----------------------------
Burton R. Lifland
Chief Judge
Bankruptcy Court of Southern District of New York